HARRIS AND HARRIS CONSTRUCTION COMPANY, INC., PLAINTIFF, v. CRAIN AND DENBO, INC., AND THE TOWN OF MOUNT OLIVE AND AETNA INSURANCE COMPANY, ADDITIONAL DEFENDANT.

(Filed 12 January, 1962.)

**1. Appeal and Error § 19—**

Where appellant notes an exception but makes no assignment of error based thereon, the exception is deemed abandoned.

**2. Trial § 56—**

Where voluminous evidence is introduced in a trial by the court under agreement of the parties, the fact that some of the evidence admitted is of questionable relevancy and some incompetent as hearsay does not require a new trial, since it will be presumed that the court disregarded the incompetent or irrelevant testimony in making its decision.

**3. Appeal and Error § 49—**

The findings of fact of the trial court are conclusive on appeal if supported by competent evidence.

**4. Contracts § 16—**

Conditions precedent are not favored by the law, and whether a condition is precedent and must be performed before the contract comes into existence, or whether it is a condition concurrent or subsequent, depends upon the intention of the parties, which is to be determined in the light of the circumstances of the case, the nature of the contract, and the relation of the parties, together with other evidence competent on the question of intent.

**5. Contracts § 12—**

The interpretation given the agreement by the parties themselves prior to controversy will be given weight in construing the instrument.

**6. Contracts § 16—    Requirement that subcontractor deposit monies in joint account held not condition precedent.**

The construction subcontract in suit provided that the subcontractor should deposit a specified sum in a bank in a joint account and that payments received for work done and payments made in the prosecution of the work should be handled through this account. The contract also provided that the contractor might take over the project if the subcontractor violated any material provisions of the agreement. The subcontractor, with the knowledge of the contractor, began the work without making the deposit. *Held:* The validity of the subcontract did not depend upon the subcontractor's ability, financial or otherwise, to begin the work or prosecute it to completion, the subcontractor's inability in any of these respects being merely cause for the taking over of the project by the contractor, and the provision for the deposit was not a condition precedent, and thus the failure of the subcontractor to make the deposit does not entitle the subcontractor to treat the contract as inoperative and it is not entitled to recover upon *quantum meruit* for work and labor expended by it in partial performance of the construction project.

CONSTRUCTION CO. *v.* CRAIN AND DENBO, INC.

**7. Contracts § 23; Waiver § 2—**

A party to a contract may excuse or waive nonperformance of a condition by the other party to the agreement, but waiver is a question of intent and does not obtain unless intended by the one party and so understood by the other, or one party has so acted as to mislead the other, and the question of intent to excuse nonperformance is ordinarily a question of fact and may rarely be inferred as a matter of law.

**8. Same; Contracts § 21— Evidence held to support finding that breach of contract was not waived and that such breach entitled the contractor to take over the project under the terms of the agreement.**

The construction contract in suit provided that the subcontractor should make a deposit in a joint account in a specified sum for the purpose of assuring the subcontractor's financial ability to perform the work. The evidence disclosed that the contractor permitted the subcontractor to unload materials at the site with the understanding that the required deposit was not waived and that the contractor repeatedly demanded compliance with the requirement of a deposit until the subcontractor categorically refused to make the deposit about a month after the work had been started. *Held:* The evidence supports the court's finding that the requirement of the joint deposit was not waived, and further that such provision was a material condition of the contract entitling the contractor to take over the project under the provisions of the agreement that the contractor might do so upon a substantial violation of any provision of the subcontract.

**9. Principal and Surety §§ 1, 9—**

The obligee of a surety bond is not ordinarily under duty to disclose to the surety facts relating to the character of the risk unless the obligee knows a fact of vital importance to the risk and knows that the surety will not be able to discover such fact in the exercise of due diligence, so that the failure to disclose such fact amounts to a contrary representation to the surety.

**10. Same— Evidence held to support finding that there was no fraudulent concealment from the surety of fact materially affecting the risk.**

One contractor agreed to bid on a construction project and then subcontract the work to another contractor for a stipulated sum. The evidence disclosed that the surety for the subcontractor would not furnish bond if the contractor took such a large profit, and suggested a profit to the contractor in a lesser amount, which provision was written into the subcontract. Thereafter, without knowledge of the surety, a letter was written suggesting a larger profit to the contractor than that specified in the subcontract. The evidence further tended to show that this letter created a suspicion on the part of the contractor that something was wrong, but the evidence did not disclose that if the contractor made further investigation it learned any facts not already known to the surety or which could not have been discovered by a reasonable investigation by the surety, and further, that the contractor did not agree to permit the letter to modify the subcontract, and so advised the subcontractor. *Held:* The burden was upon the surety to prove a fraudulent concealment of a fact materially affecting the risk, and since the secret modification

did not become effective, the risk to the surety was in no way increased thereby, and therefore, the evidence supports the court's finding that there was no fraudulent concealment of material facts affecting the risk entitling the surety to nonsuit in the contractor's action to recover damages resulting from the subcontractor's breach of the agreement.

## 11. Damages § 8—

An injured party is under duty to minimize the resulting damages if he can do so with reasonable exertion or trifling expense, but the burden of proving failure of the injured party to take reasonable steps to minimize the loss is on the party asserting such failure, and nonsuit on the ground that the entire loss could and should have been avoided may not be allowed on movant's evidence unless such evidence establishes such failure so clearly that no other reasonable inference may be drawn therefrom.

## 12. Same— Evidence held not to show arbitrary refusal of injured party to execute substitute contract which would have avoided loss.

The contractor took over the performance of the work upon breach of condition by the subcontractor, and sought to recover against the subcontractor and the surety on the subcontractor's performance bond for the resulting loss. The surety introduced evidence that after the breach, a third contractor proposed to take over the project so as to avoid all loss. The evidence further tended to show that the contractee made investigation and advised the contractor by letter that it was not approving subletting the work to the third contractor because it found that such third contractor had no experience record in construction work sufficient to justify approving subletting to the third contractor. *Held:* The contractor was liable to the contractee for the performance of the work, and therefore the surety's evidence does not show as the sole reasonable inference that the refusal of the contractor to sublet the work to the third contractor was arbitrary and unreasonable, and the surety's motion to nonsuit was properly denied.

## 13. Contracts § 29—

Where, as a result of breach of contract by the subcontractor, the contractor takes over the performance of the work, the contractor is entitled to recover the sums expended by it in the performance of the work and the profit it would have realized except for the breach by the subcontractor.

## 14. Same—

Where the contractor takes over the project upon breach of the subcontract by the subcontractor, and sues for the resulting damages, the allowance of all on-the-job overhead of the contractor as an item of damage precludes the allowance, in *addition*, of a percentage of the contractor's general overhead expenses, it being provided in the subcontract that the general overhead expenses of the *contractor should be paid from its* profits, and loss of profits being recovered by the contractor as a separate item.

## 15. Damages § 2; Contracts § 29—

While interest should not ordinarily be allowed upon a claim for un-

liquidated damages, the tendency is to allow interest on the amount ascertained as damages for breach of contract, and it is at least within the discretion of the trial court in a trial by the court under an agreement of the parties to allow interest on the amount of damages ascertained by it from the date of demand by the injured party. G.S. 24-5.

APPEAL by plaintiff, Harris and Harris Construction Company, Inc., and additional defendant, Aetna Insurance Company, from *Mintz, J.*, May 15, 1961 Civil Term of WAYNE.

Harris and Harris Construction Company, Inc. (hereinafter referred to as "Harris"), and Crain and Denbo, Inc. (hereinafter called "Crain"), are corporations organized under the laws of this State and have their principal offices in Durham, North Carolina. The Town of Mount Olive is a municipal corporation and is located in Wayne County, North Carolina. Aetna Insurance Company (hereinafter called "Aetna") is a Connecticut corporation and is duly licensed to do business in North Carolina.

On 26 June 1956, pursuant to public notice, Mount Olive received bids for construction of water and sewer improvements. Crain submitted a bid and was awarded the contract. Harris did not have a state contractor's license and could not bid, but had requested that Crain bid. Crain is a licensed contractor. The proposal was prepared by Harris, revised by Crain, and submitted. It was the understanding that Harris was to do the work as subcontractor. On 6 July 1956 the Town and Crain executed the prime contract for construction of the improvements. On the same date Harris and Crain executed a subcontract. Among other things the subcontract required that Harris furnish a performance and payment bond and, before beginning work, make a deposit of $30,000 in a designated bank, the deposit to be subject to joint control. On 20 July 1956 Aetna executed a performance and payment bond as surety for Harris. Harris ordered materials and, with permission of Crain, unloaded and placed them on the job, and made other preparations for construction. Harris did not make the $30,000 deposit, but began laying water lines on August 17. When Crain learned that the water lines were being laid, it ordered Harris to stop work, advised that the subcontract was in default for failure to make the required deposit, and stated that it (Crain) was taking over the construction. Harris worked on August 17th and 18th, but did not return to work on the 20th, Monday. Crain began construction work on August 22nd. Harris resumed work on August 27th, but Crain demanded of the Town engineers that Harris be removed from the job. Harris' employees were arrested by a police officer for trespassing. Harris did not return to the job after August 27th. Crain finished the construction and it was accepted by the Town on 13 December 1957.

The cost incurred by Crain in constructing the improvements was greatly in excess of the subcontract amount. On 31 December 1957 Crain demanded of Aetna that it pay the deficiency pursuant to its performance and payment bond.

Other pertinent facts are set out in the opinion.

Harris instituted this action against Crain for damages for breach of the subcontract, and, on motion of Harris, the Town of Mount Olive was made a party defendant. Harris alleged that the Town conspired with Crain to prevent Harris from performing the subcontract. Crain answered, denied that it had breached the subcontract, and set up counterclaim for the excess of the cost of construction above the contract amount. On motion of Crain, Aetna was made an additional defendant and required to answer upon its obligation in the performance and payment bond.

All parties waived jury trial. The case was heard by Mintz, J., sitting as judge and jury. Plaintiff, Harris, offered evidence and rested. The motion of the Town of Mount Olive for nonsuit was allowed. Crain and Aetna offered evidence. The court found facts, made conclusions of law, and entered judgment. It was adjudged that plaintiff, Harris, recover nothing, and that Crain have and recover of Harris and Aetna, jointly and severally, the sum of $257,432.34 together with interest thereon at 6% per annum from 31 December 1957 until paid.

Plaintiff, Harris, and additional defendant, Aetna, appealed and assigned errors.

*J. L. Zimmerman and Williams & Zimmerman for plaintiff appellant.*

*Fletcher, Lake and Boyce for Aetna Insurance Company, appellant.*

*Brooks and Brooks; Jones & Vann; and Taylor, Allen and Warren for defendant Crain and Denbo, Inc., appellee.*

MOORE, J. Appeals, involving procedural questions, in cases relating to the subject matter of this action have been heard by this Court on two previous occasions. *Crain and Denbo, Inc. v. Construction Co.,* 250 N.C. 106, 108 S.E. 2d 122 (1959); *Crain and Denbo, Inc., v. Construction Co.,* 252 N.C. 836, 114 S.E. 2d 809 (1960). The instant case was instituted in Durham County. On motion the court in its discretion, for convenience of witnesses, removed it to Wayne County for trial.

At the close of plaintiff's evidence the court allowed the motion of the Town of Mount Olive for nonsuit. Plaintiff noted an exception, but makes no assignment of error based thereon. The exception is deemed

abandoned. *Rose v. Bank,* 217 N.C. 600, 9 S.E. 2d 2. The Town is not involved on this appeal.

Plaintiff's assignments of error 1 to 5 bring forward numerous exceptions to the admission and exclusion of evidence. Each has been carefully considered. We find in them nothing sufficiently prejudicial to warrant a new trial. True, some of the evidence admitted is of questionable relevancy, and some is of the hearsay variety. But "in a hearing by the court under agreement of the parties, the rules of evidence are not so strictly enforced as in a trial by jury, since it will be presumed that incompetent evidence was disregarded by the court in making its decision." 4 Strong: N. C. Index, Trial, S. 56, p. 363. The evidence excluded is either immaterial or is irrelevant to plaintiff's theory of the case.

Plaintiff's assignments of error 6 to 30 are addressed to findings of fact. It is contended in some instances that the findings are not supported by the pleadings, and in others not supported by competent evidence. The arguments in plaintiff's brief in support of these assignments are summary, general and indefinite. It is doubtful that they are in compliance with the rules of this Court. Rule 28, Rules of Practice in the Supreme Court. To consider and discuss these assignments severally the Court would be required to make repeated voyages of discovery through the record and list and catalog the evidence bearing upon each questioned finding of fact. The printed record contains 764 pages. In addition, there are voluminous exhibits which are not included in the bound record. The entire record has been carefully read and considered. In our opinion the findings of fact deal with the material issues raised by the pleadings. Where a jury trial has been waived, the findings of fact of the trial judge are as effective as the verdict of a jury, and are conclusive on appeal, if there is competent evidence to support such findings. *Reid v. Johnston,* 241 N.C. 201, 85 S.E. 2d 114. It is our opinion that the findings of fact questioned by plaintiff are supported by competent evidence, except as hereinafter stated.

Plaintiff's action was laid upon the theory that the subcontract was breached by Crain, the work was wrongfully taken over by Crain, plaintiff was dismissed and prevented from performing his obligations under the subcontract by Crain's injurious conduct, and plaintiff was damaged by reason of the breach on Crain's part. Plaintiff insisted at all times that it was entitled to perform the work. Yet, at the close of plaintiff's evidence, the court allowed its motion to be permitted to amend the complaint so as to allege a cause for relief upon *quantum meruit* — $32,769.55 for labor performed and materials furnished.

Pursuing the *quantum meruit* theory, plaintiff contends that the

provision of the subcontract requiring it to deposit $30,000 in a joint account was a condition precedent to the taking effect of the subcontract, that the deposit was never made and therefore the subcontract never became a binding agreement, and that plaintiff is entitled to recover the value of labor performed and materials furnished by it in prosecution of the work.

The subcontract stipulates the respective rights, duties and obligations of Harris and Crain with respect to the work, fixes their compensation, and in clause 14 provides:

"(a) Before the Sub-Contractor shall begin his work, a Special Account shall be opened in the Durham Industrial Bank in the name of HARRIS AND HARRIS, MOUNT OLIVE ACCOUNT. The Sub-Contractor agrees to deposit in this account the sum of THIRTY THOUSAND ($30,000.00) Dollars with which to finance his operations, and no part of this said $30,000.00 is to be withdrawn from the account until this account is disbursed as outlined hereinafter and after final payment is received from the Town of Mount Olive, N. C., by the Contractor at the completion and acceptance of the work.

"(b) Disbursements from this Special Account shall be made only by checks drawn against it for the sole purpose of paying for the items listed in Clause 2 as direct costs of the work. Checks shall be signed by Mr. W. A. Harris for the Sub-Contractor and countersigned by H. S. Crain or E. M. Denbo for the Contractor.
. . .

"(c) Applicable funds derived from the performance of the work will be deposited in the Special Account by the Contractor as set forth in Clause 15(c) hereinafter.

"(d) If, at any time, the funds in the said Special Account shall be insufficient to pay the sum total of any payrolls or other bills then owing for items of expense referred to in Clause 2, then it shall be the obligation of the Sub-Contractor to promptly deposit such additional funds as may be required to pay all such bills, payroll or other expenses then owing. . . ."

The question then is whether making the deposit was a condition precedent, a condition to be performed before the agreement of the parties could become a binding contract.

The trial court concluded as a matter of law that "the making of a deposit of $30,000.00 by Harris and Harris Construction Company, Inc., as required by clause 14(a) of the subcontract . . . was not a condition precedent to the taking effect of a valid and binding subcontract between the parties."

". . . (A) contract is not made so long as in the contemplation of both parties thereto something remains to be done to establish contract relations . . . In negotiating a contract the parties may impose any condition precedent, a performance of which condition is essential before the parties become bound by the agreement." *Federal Reserve Bank v. Manufacturing Co.*, 213 N.C. 489, 493, 196 S.E. 848. "Breach or non-occurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability. . . ." 3 Williston on Contracts (Rev. Ed.), s. 665, p. 1909. "Whether covenants are dependent or independent, and whether they are concurrent on the one hand or precedent and subsequent on the other, depends entirely upon the intention of the parties shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and other evidence which is admissible to aid the court in determining the intention of the parties." *Wade v. Lutterloh*, 196 N.C. 116, 120, 144 S.E. 694 (citing Page on the Law of Contracts, Vol. 5, 2nd Ed., s. 2948).

The parties by their acts and conduct showed that they considered the subcontract effective and binding long before Harris defaulted in making the deposit. The time set by the town engineers for beginning construction was August 1st. Harris, with approval of Crain, ordered materials for the project immediately after the letting on June 26th. It continued to order materials after the subcontract was executed on July 6th. It unloaded the materials and placed them on the job, procured a storage lot, rented an office, and made other preparations to begin construction. On July 20th Harris furnished a performance and payment bond with surety, as required by the subcontract. There was no definite refusal to make the deposit until about the middle of August. In its pleadings Harris alleged with particularity the existence of the subcontract and the breach thereof by Crain. It at no time before trial contended that the subcontract was not binding. Crain has consistently maintained that the subcontract is effective. Aetna regarded the subcontract as binding, and when Crain declared Harris to be in default and took over the work Aetna proposed substitute subcontractors. ". . . (T)he *ante litem motam* practical interpretation of the parties is a safe guide in the interpretation of contracts." *Jones v. Realty Co.*, 226 N.C. 303, 37 S.E. 2d 906. "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise. . . ." Restatement of the Law, Contracts, s. 261.

Crain submitted the bid and executed the prime contract at the solicitation of Harris. When Harris and Crain thereafter signed the subcontract, the positive duty was immediately cast upon Harris or

Crain, one or the other, to construct or cause to be constructed the water and sewer improvements in any event. The performance of the duty, and the right to receive compensation therefor from the Town, on the part of Harris or Crain, one or the other, did not depend on a deposit being made by Harris. By the terms of the subcontract Crain was authorized to take the prosecution of the work out of the hands of Harris if Harris defaulted in certain specified respects or was "guilty of a substantial violation of any provision (of the) . . . subcontract." Under the subcontract Harris might default before beginning work or at any time during its prosecution. The requirement that Harris make the deposit was for the purpose of assuring Crain that Harris had financial ability to make the improvements which were to cost the Town approximately a half million dollars. The provision for the deposit and joint account was only a part of the contract, albeit an important part. If Crain took over the work pursuant to the provisions of the subcontract and the cost to Crain was greater than the contract amount, then Harris or his surety was obligated to pay Crain the difference. The fact that no duty of performance on either side can arise until the happening of a condition does not necessarily make the validity of the contract depend upon it happening. 3 Williston on Contracts, s. 666, p. 1912.

In our opinion the deposit requirement was not a condition precedent to the taking effect of the subcontract and Harris' liability thereunder. ". . . (T)he provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction." *Larson v. Thoresen*, 254 P. 2d 656 (Cal. 1953). The clause in question was merely a condition precedent to Harris' right to begin work, and the validity of the subcontract did not depend upon his ability, financial or otherwise, to begin the work or to prosecute it to completion.

Plaintiff further contends that, if the subcontract was valid and binding, the provision thereof requiring it to deposit $30,000 in a joint account before beginning work was waived by Crain when Crain consented to and approved the ordering of materials, placing them on the job, procuring a storage site, renting an office and making other preparations for laying water and sewer lines. In short, plaintiff says that work had begun with the consent of Crain, the deposit requirement was thereby waived by Crain, and Crain's taking over of the work was wrongful and in violation of the subcontract.

It is well established that a written contract may be waived, and the provisions in a contract may be waived. A waiver takes place where a man dispenses with the performance of something which he has a right to exact. A party may excuse performance expressly or by

conduct which naturally and justly leads the other party to believe that performance is dispensed with. There can be no waiver unless so intended by one party, and so understood by the other, or one party has so acted as to mislead the other. It is a question of intent, which may be inferred from a party's conduct. Intent is an operation of the mind and should be proven and found as a fact and is rarely to be inferred as a matter of law. *Manufacturing Co. v. Lefkowitz,* 204 N.C. 449, 168 S.E. 517, and authorities there cited.

The trial court found as a fact that neither Crain nor Harris "waived or intended to waive the requirement of the sub-contract agreement . . . that the sum of $30,000.00 was to be deposited in a Special Account before the sub-contractor should begin work. . . ." (Finding of Fact 11).

Crain consented and agreed that Harris might order and unload materials. There was evidence on the part of Crain that when Harris requested permission to unload pipe and other materials consent was given with the distinct understanding that the required deposit was not waived and no pipe was to be laid until the deposit was made. There was also evidence that Crain repeatedly demanded, verbally and by letter, compliance with the deposit requirement during the period from the signing of the subcontract to the middle of August when Harris categorically refused to make the deposit. The finding of fact by the court is supported by competent evidence and will not be disturbed.

Plaintiff further insists that if the failure to make the deposit was a breach of the subcontract, "it is not a material or substantial breach for which rescission is permitted." Crain does not seek to rescind the subcontract; it seeks damages for the breach. *Childress v. Trading Post,* 247 N.C. 150, 100 S.E. 2d 391. The court concluded as a matter of law that the failure of Harris to make the deposit justified Crain "in declaring the sub-contract in default and in taking over the performance of the work." This is in accord with the express agreement and understanding of the parties. The subcontract authorizes Crain to take over the work if Harris is "guilty of a substantial violation of any provision (of the) . . . sub-contract." The violation was not only substantial but complete.

We agree with the finding of the court below that Harris "breached its subcontract . . . and . . . is not entitled to recover against Crain and Denbo, Inc."

Aetna assigns as error the overruling of its motion for nonsuit. Aetna contends that the motion should have been allowed on either of two grounds: (1) That Crain and Harris made an agreement which increased the surety's risk and failed to disclose this agreement to

Aetna, or at the very least, Crain had knowledge of facts increasing the risk, which facts were not known to Aetna and were not disclosed to it by Crain; (2) that any loss sustained by Crain is due to its failure to take reasonable steps to avoid loss after it took over the work from Harris.

(1). On 26 June 1956, the day Crain submitted its bid, Harris delivered a letter to Crain agreeing to subcontract the project for a sum $80,000 less than the award, and thereby to allow Crain a profit of $80,000. Harris had previously applied to Aetna for performance bond, and Aetna had an agent present when the bids were opened. The agent learned that the letter had been given, stated to Crain and Harris that Aetna would not furnish bond on this basis, and suggested a profit to Crain of 4% of the award. The subcontract which was executed on July 6th incorporated the 4% suggestion. On July 7th a letter was written on Crain's typewriter and signed by Harris, stating that Harris would pay Crain a profit of $72,500, less 4% of the award. A copy of the subcontract was delivered to Aetna, but it knew nothing of the letter of July 7th until after the commencement of litigation. The bond was executed by Aetna on July 20th. Harris offered evidence that an officer of Crain dictated the letter and it was typed by a stenographer employed by Crain. Crain's evidence tends to show that Harris had at times used Crain's facilities for writing letters, this letter was not dictated by anyone connected with Crain, it was found at Crain's office by one of its officials, Crain's officials conferred and came to the conclusion something was wrong and thought that a further investigation should be made immediately as to Harris' ability to perform the contract, Crain conferred with its attorney and on the advice received filed the letter and advised Harris by telephone that the letter was not accepted and Crain would not agree to it, no rejection was noted on the face of the letter and it was not called to the attention of Aetna. Aetna knew that Harris was not licensed, had written bonds for Harris on prior occasions, made an investigation on this occasion but did not request any information from Crain.

"If the creditor 'knows or has good grounds for believing that the surety is being deceived or misled, or that he was induced to enter into the contract in ignorance of facts materially increasing the risk, of which he has knowledge, and he has an opportunity before accepting his undertaking, to inform him of such facts, good and fair dealing demand that he should make such disclosure to him; and if he accepts the contract without doing so, the surety may afterwards avoid it.'" 4 Williston on Contracts, Rev. Ed., s. 1249, p. 3577. "It was at one time asserted . . . that all the information in obligee's power must be given to enable the promisor to estimate the character of the risk he

CONSTRUCTION CO. *v.* CRAIN AND DENBO, INC.

is invited to undertake. This view, however, finds no support today. 'A surety is in general a friend of the principal debtor, acting at his request, and not at that of the creditor; and, in ordinary cases, it may be assumed that the surety obtains from the principal all of the information which he requires.' This is the rule applicable unless there is some fact, which the creditor knows the surety probably will not discover, of such vital importance to the risk that the creditor must have been aware that the non-disclosure would in effect amount to a contrary representation to the surety." *ibid,* pp. 3575-6. "The concealment must in fact or in law be fraudulent." 50 Am. Jur., Suretyship, s. 164, p. 1012. "There is nothing in the mere nature of the contract of suretyship itself which requires the obligee to disclose to the proposed surety all the material facts affecting the risk. There must be a duty on the part of the obligee to make the disclosure. . . ." *ibid,* s. 165, p. 1012.

Aetna alleged that Harris and Crain, with intent to deceive and defraud Aetna and thereby induce it to execute the bond, as surety, concealed the letter in question from Aetna, and falsely represented to Aetna that the subcontract was the entire agreement. This is an affirmative defense and the burden is upon Aetna to sustain the allegation unless Crain by its own evidence establishes the defense so that the only reasonable inference that can be drawn from such evidence is that Crain was guilty of fraudulent concealment, affecting the surety's risk. *Slaughter v. Insurance Co.,* 250 N.C. 265, 108 S.E. 2d 438. The evidence in the light most favorable to Crain is that Crain did not agree to permit the letter to modify the subcontract in any way and so advised Harris. In this view the alleged secret modification did not become effective and the risk to the surety was in no way increased. It is true that the letter created a suspicion on the part of Crain that something was wrong. If Crain made any further investigation of Harris' ability to perform the subcontract agreement, the evidence does not disclose that Crain learned any facts not already known to Aetna or which Aetna could not have discovered by a reasonable investigation of its own. Aetna was not entitled to a nonsuit on this ground. The court found as a fact that there was no secret, supplemental agreement, and no fraudulent concealment of material facts affecting the risk (Finding of Fact 18). This finding is based on competent evidence and is conclusive.

(2). "A party injured by the breach of contract by the other party thereto is required to protect himself from loss if he can do so with reasonable exertion or trifling expense, and ordinarily will be allowed to recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided." 2 Strong: N. C. Index,

Damages, s. 8, p. 8; *Troitino v. Goodman*, 225 N.C. 406, 35 S.E. 2d 277.

On 15 September 1956, about three weeks after Crain had taken over the Mount Olive project, Fields and Associates, consisting of W. G. Fields and wife and F. M. Carlisle, offered in writing to complete the project on the same terms as those contained in the Harris subcontract, and to begin work two days later. The offer was to remain open for nine days. Attached to the offer was a list of equipment valued at $65,940, a list of assets of Mr. and Mrs. Fields showing net worth of approximately $300,000, and a commitment for a loan of $50,000. Aetna offered to make substitute bond for Fields and Associates. Crain submitted the proposal to the project engineer, employed by the Town. Crain did not recommend or request either the approval or rejection of the proposal. The prime contract required Crain, the contractor, to submit in writing the names of proposed subcontractors to the project engineer, and prohibited the employment of "any that the Engineer may object to as incompetent or unfit." The project engineer in a letter to Crain on 21 September 1956 stated: "After carefully checking the background or construction experience of all of the principals involved in this proposed subcontract, we find no experience record in construction work of this type where we as Engineers for the Town of Mount Olive could justify approving them on a project of anywhere near this size. . . . (W)e are not approving your subletting of this work to (Fields and Associates). . . ." Crain then declined the offer. Aetna contends that the project engineer's statement is not a finding of incompetency or unfitness, that the failure and refusal of Crain and the project engineer to approve and accept the offer was arbitrary, and that Fields and Associates had sufficient assets to have saved Crain and Aetna from loss had the offer been accepted.

Under the prime contract Crain was responsible to the Town for all acts and omissions of his subcontractors and of all persons either directly or indirectly employed by it. The burden of showing arbitrariness is upon Aetna. "Where the rule as to the duty to minimize damages applies, the party who is at fault has the burden of showing matters in mitigation." 2 Strong: N. C. Index, Damages, s. 8, p. 8; *Bank v. Bloomfield*, 246 N.C. 492, 501, 98 S.E. 2d 865. As to this, Aetna stands in the shoes of Harris. If from the evidence of Crain arbitrary and unreasonable conduct appears so clearly that no other reasonable inference may be drawn and the defense is thus established, the motion for nonsuit should have been allowed. But if contrary inferences are permissible, it was a question for the jury (judge in this case).

Crain's evidence tends to show that the project engineer contacted

the city manager of Chapel Hill, N. C. (home of Fields and Associates), various contractors, materialmen, and others. He was advised that the man proposed for foreman had recently been dismissed from a job for drinking, that W. G. Fields had retired from business, and that Fields' son had some small equipment and had been doing small jobs. Carlisle, one of the associates, had been working on the Mount Olive job as resident engineer and an employee of the project engineer; he was competent for such duties as had been assigned to him but had had no experience in contracting and general project management; he had had some former connection with Harris. Fields and Associates was not a going concern and had no organization. Crain advised Aetna that it was willing to accept a qualified substitute contractor if approved by the project engineer, but no other substitutes were proposed.

This evidence tends to show reasonable investigation and decision on the part of the project engineer. His letter to Crain is in effect a finding of unfitness of Fields and Associates. There is no evidence that Crain exerted any influence on the project engineer to withhold approval. There was a question of fact to be determined. The court found as a fact "that the action of the Engineer in making such investigation was reasonable and made in good faith and was not arbitrary or capricious" (from Finding of Fact 19). This concludes the matter.

The court did not err in denying Aetna's motion for nonsuit.

Because of unusually rainy weather, soil conditions and the fact that defects in the work done by Harris had to be corrected, the cost incurred by Crain in completing the project was greatly in excess of the contract amount. Among the items of expense claimed by Crain and allowed by the court was one of $36,657.82 for "overhead." Aetna contends that overhead is not an allowable expense in this case as a matter of law, and that there is no evidence in the record to sustain a finding of overhead expense attributable to a breach of contract on the part of Harris.

In a suit for damages arising out of a breach of contract the party injured by the breach is entitled to "full compensation for the loss and to be placed as near as may be in the position which he would have occupied had the contract not been breached." *Troitino v. Goodman,* *supra.* Crain is entitled to recover his loss, or the value of his contract, consisting of two distinct items: (1) what has been expended towards performance (less the value of materials on hand); and (2) the profit which would have been realized had there been no breach. *Machine Co. v. Tobacco Co.,* 141 N.C. 284, 295, 53 S.E. 885.

We have not, after careful search, found a North Carolina decision bearing directly upon the question as to whether or not general over-

head expenses, such as those claimed by Crain, are legitimate charges as part of the cost of performance. Decisions from other jurisdictions have been examined. In a suit upon a building contract, providing for compensation on a cost plus basis, a claim for general overhead expenses, including salaries of executive or administrative officials, interest charges, depreciation, taxes and general office expenses, was not allowed. *Lytle, Campbell & Co. v. Somers, Fitler & Todd Co.,* 120 A. 409 (Pa. 1923). In suits by contractors for damages resulting from work interruptions and delays caused by conduct of owners, overhead expenses were allowed, but these expenses consisted of on-the-job overhead such as supervision of employees, timekeepers, maintenance of euipment, office and telephone, car fares and incidental expenses. *Grand Trunk Western R. Co. v. H. W. Nelson Co.,* 116 F. 2d 823 (6th Cir. 1941) ; *M. H. McCloskey, Jr., Inc. v. U. S.,* 66 Ct. Cls. 105 (1928). Where owners wrongfully terminated building contracts and dismissed the contractors, in actions upon *quantum meruit* the contractors were allowed overhead expenses, but whether these expenses were confined to on-the-job overhead does not clearly appear. *Snyder v. School District of the City of Reading,* 166 A. 875 (Pa. 1933) ; *Dravo Contracting Co. v. James Rees & Sons Co.,* 140 A. 148 (Pa. 1927). In a case in which the contractor failed to perform any part of the contract and the owner completed the work and sued the contractor for the cost of the work in excess of the contract amount, overhead expenses were allowed, and the court said: "It is now well recognized that contractors have an overhead expense. This varies with the size and character of the contract and the amount involved. It is computable by experience." *Elias v. Wright,* 276 F. 908 (2d Cir. 1921). In a case involving contractor and subcontractor, the subcontractor declared the contract breached, quit work, and sued the contractor for the value of services performed; the contractor counterclaimed against the subcontractor and surety; the contractor's recovery included a 10% charge for overhead. On appeal the overhead was allowed, but no profit. *Sofarelli Bros. v. Elgin,* 129 F. 2d 785 (4th Cir. 1942).

In an action for damages for breach of a construction contract "The profits and losses must be determined according to the circumstances of the case and the subject matter of the contract." *Grand Trunk Western R. Co. v. H. W. Nelson Co., supra.*

Crain, in calculating the general overhead claimed by it, prorated the total overhead expenses for the construction period among the projects being constructed during the period, in accordance with respective amounts involved in the several projects. 48.77% of general overhead was allocated to the Mount Olive project. The total general overhead was $77,414.13. In addition to the claim for general over-

head, Crain claimed the following items as on-the-job expenses: Rent (office and typewriter) $1420.00; telephone and telegraph $1521.36, travel $969.25, use of automobile $1651.00, miscellaneous services $2082.12, miscellaneous expense $807.75, and other similar items, all totalling $13,905.52. These seem to cover in part, at least, on-the-job overhead. Hal S. Crain, testifying for Crain, said: "Had Harris & Harris performed the work, I don't think it would have taken very much to keep the books and records. . . . That item, $36,078.00, which we label 'overhead' includes other than keeping the books, rent, telephone, telegraph, our general expenses in the home office. . . . We apportioned the general operating expense of our Durham Office, including such things as the salary of our secretary in the Durham office. . . . I believe we employed additional help in our Durham office because of the Mount Olive job at the peak, though not through the whole project. I do not remember what that total is. I do not think we allocated that specifically to the Mount Olive job. . . . If Harris & Harris had completely performed the contract, we might have incurred approximately the same overhead expenses, but we would have had additional work. . . . If Harris & Harris had performed their contract, our secretary's salary would have been the same. It would be a speculation as to whether the other expenses of our office would have been substantially the same. I don't know how to answer that. I do not know how much of the expense of running our Durham office for these 15 months was due directly to the fact that Harris & Harris did not perform the subcontract."

The subcontract between Harris and Crain provided 4% of the project amount for profit to Crain, out of which Crain was to maintain a superintendent on the job, construct a shed, and keep the books and records for the project. Prior to the execution of the subcontract the parties had agreed on a profit of $80,000.00 to Crain. After the execution, Harris offered a profit of $72,500.00 but Crain refused it. It is our interpretation of the contract that the parties intended that general overhead expenses of Crain should be paid from profit. Furthermore, the subcontract contemplated that Crain, under specified circumstances, might have to take over the work, yet the contract fails to provide for Crain to receive extra profit or compensation in such event. It is our opinion, and we decide, as a matter of law that the court erred in allowing Crain the item of $36,657.82 for overhead, and that it is entitled to recover only such damages and expenses as resulted directly from the breach by Harris, plus the profit provided for in the contract.

Since the sum of $36,657.82 is to be deducted from Crain's recovery herein, the $1420.00 deducted from profit in Finding of Fact 47, on

account of clerical help for bookkeeping, shall be added to the recovery.

In the subcontract Crain agreed to place a general superintendent on the project without cost to Harris. It was contemplated that this expense should be paid by Crain from profits. The salary of the superintendent was included by Crain in labor costs. However, the court deducted it from profits and thereby allowed credit in accordance with the contract (Finding of Fact 47).

The final question is whether or not the court erred in allowing interest on Crain's recovery from 31 December 1957, the date of Crain's demand for payment from Aetna.

Aetna at all times denied liability and refused payment.

On 31 December 1957 Crain demanded payment of $359,697.62. In an action filed by it in Wayne County on 28 April 1958 the same amount was demanded. When its counterclaim was filed in this action the amount claimed was $300,672.07. By amendment at the trial the claim was reduced to $296,083.55. By further amendment at the trial the claim was down to $276,083.45. Crain's accountant testified that the loss, as of 31 December 1957, was $242,749.50. The judgment allows a recovery of $257,432.34.

"It may be stated as a general rule, that interest is not allowed on unliquidated damages or demands, for the reason that the person liable does not know what sum he owes and therefore, can be in no default for not paying." 15 Am. Jur., Damages, s. 161, pp. 579, 580. "Although a claim may in a sense be unliquidated, interest thereon will generally be allowed where the amount due can readily be ascertained by mere computation, or by a legal or recognized standard." 47 C.J.S., Interest, s. 19, p. 31.

We have a statute which provides that "all sums of money due by contract of any kind, except money due on penal bonds, shall bear interest, and when a jury shall render a verdict therefor they shall distinguish the principal from the sum allowed as interest. . . ." G.S. 24-5.

*Lewis v. Rountree*, 79 N.C. 122 (1878), was an action to recover damages for breach of warranty of quality of rosin. With respect to interest the court said: "It is a rule which may be gathered from the cases that whenever a debtor has notice or ought to know that he owes a *certain* sum, and when he is to pay, if he fails to pay it, he ought to pay interest. In the present case although we may assume that the defendant had notice by the commencement of the action, that he was looked to for the payment of damages, yet as a fact, not only was the amount technically unliquidated, but owing to the unsettled state of

the law, it was uncertain. He could not safely and without risk pay any sum until it was ascertained by a judgment. . . ."

The *Lewis* case was criticized in *Bond v. Cotton Mills*, 166 N.C. 20, 81 S.E. 936 (1914), an action by creditors of an insolvent contractor to recover the balance due the contractor on a building contract. The Court makes reference to the statute (now G.S. 24-5) and states the following rule: ". . . (W)henever a recovery is had for breach of contract and the amount is ascertained from the terms of the contract itself or *from evidence relevant to the inquiry*, . . . interest should be added. . . ." (Emphasis added.)

Since the decision in *Bond* there has been a definite trend in the North Carolina cases toward allowance of interest in almost all types of cases involving breach of contract. The following cases should be examined in this light. In *Perry v. Norton*, 182 N.C. 585, 109 S.E. 641, defendant, in order to retain plaintiff as an employee, promised plaintiff $40.00 per month salary, a house rent free, and to deed plaintiff the house when the plantation on which it was located was sold. Defendant sold the plantation and house to another. Plaintiff sued for value of improvements made on the house and land, and for services rendered. He recovered judgment with interest from the date of the sale of the plantation. This Court affirmed stating that "the jury 'ascertained from the terms (of the agreement) and the relevant evidence' the amount of plaintiff's claim." *Thomas v. Realty Company*, 195 N.C. 591, 143 S.E. 144, was a suit upon *quantum meruit* for services rendered. The Court declared that the measure of damages was "the reasonable value of the services rendered." Plaintiff recovered $18,500 with interest from 5 June 1925, the date on which services were completed and demand for payment was made. The Supreme Court found no error and stated: "This sum is due, by contract, and under C.S., 2309 (now G.S. 24-5) bears interest from the date on which it was due."

For cases in which interest has been allowed upon judgments recovered upon surety contracts, see *Carrig v. Gilbert-Varker Corporation*, 50 N.E. 2d 59 and *George H. Sampson Co. v. Commonwealth*, 88 N.E. 911. It is true that Crain counterclaimed for more than was due, but Aetna could have paid the part which was definitely ascertained and contested the disputed portion, or could have "tendered the correct amount and stopped the running of interest." *Miller v. Barnwell Bros., Inc.*, 137 F. 2d 257 (4th Cir. 1943).

At the very least it was within the discretion of the court to allow interest in this case, and we cannot say, as a matter of law, that in doing so the court erred. Interest starts running from the date of de-

mand, 31 December 1957. *High Point v. Power Co.,* 120 F. 2d 866
(4th Cir. 1941).

The judgment of the court below decreeing that Crain and Denbo,
Inc. recover the sum of $257,432.34, will be modified by subtracting
from said sum $36,657.82, and then adding $1420.00, thereby making
the principal recovery $222,194.52 instead of $257,432.34. In all other
respects the judgment is affirmed. The cause is remanded to the Su-
perior Court of Wayne County that judgment may be entered in ac-
cordance with this opinion.

Modified and affirmed.