BARRETT, ROBERT & WOODS, INC. v. CLEMENT EDSON ARMI

No. 8115SC1185

(Filed 19 October 1982)

1. **Contracts § 6.1; Rules of Civil Procedure § 56— unlicensed contractor—defense raised in summary judgment motion**

   The trial court erred in rejecting defendant's defense that plaintiff was barred from recovering under a construction contract because plaintiff was not licensed as a general contractor during the majority of the construction period on the ground that the defense was not properly raised where the defense was raised for the first time in defendant's motion for summary judgment, since unpleaded affirmative defenses are deemed to be part of the pleadings when such defenses are raised in a hearing on a motion for summary judgment. G.S. 1A-1, Rules 8(c) and 56, G.S. 87-1 and G.S. 87-10.

2. **Contracts § 6.1— general contractor—substantial compliance with licensing requirements**

   Plaintiff general contractor substantially complied with the licensing requirements of G.S. 87-10 so as to entitle plaintiff to recover under a contract to construct a house for defendant at a price exceeding $30,000 where plaintiff was duly licensed as a general contractor at the time the contract was executed in October 1977; plaintiff's general contractor's license expired on 31 January 1978 because plaintiff's secretary-treasurer inadvertently failed to file a renewal application; approximately 10% of the work required under the contract had been done at the time the license expired; plaintiff's license was renewed on 11 October 1978 immediately after plaintiff filed its renewal application, renewal fee and a late filing fee; plaintiff completed the job in early October 1978, and defendant moved in immediately thereafter; and plaintiff remained stable in terms of financial condition, managing officers, composition and nature of the business and all other matters relevant to its license during the entire period of construction under the contract.

3. **Contracts § 21.2— regular monthly statements—substantial compliance with contract's requirement**

   Plaintiff general contractor substantially complied with a provision of a cost plus construction contract requiring it to provide defendant with regular monthly statements detailing expenditures to date where plaintiff provided statements to defendant in April, May, July, August and September 1978; the first statement was not provided until five months after execution of the contract because, due to severe and unusual weather and soil conditions which delayed construction, the expenditures to that date were minimal; although the July statement reflected only a 7% cost overrun and the final accounting revealed a cost overrun of over 30%, the July statement did reflect expenditures to date as required by the contract, and defendant was informed shortly thereafter of the outstanding invoices not disclosed in the statement; after being so informed, defendant continued his previous course of selecting the most expensive materials and construction methods; and in September plaintiff sent defendant a written statement of costs in anticipation of closing.

**4. Contracts § 21.2 — failure to complete construction within required time — unforeseen circumstances**

The trial court did not err in determining that plaintiff's failure to complete construction of a house within 180 days as required by contract was caused by five months of unusually severe weather, defendant's numerous change orders and defendant's detailed involvement in the project which constituted "unforeseen circumstances beyond the builder's control" within the purview of an absolving provision in the contract.

**5. Contracts § 21.2 — cost plus contract — salary of supervisor removed from job**

In an action to recover under a cost plus contract for the construction of a house, the trial court properly permitted plaintiff to include the salary of its construction supervisor as a charge to defendant until the end of the job, although the supervisor had been relieved of responsibility for dealing with defendant at defendant's request some six weeks before the house was completed, where the contract provided that plaintiff's costs would include the supervisor's salary "for the duration of construction as overseer," and the supervisor continued to oversee the job until the end of construction by consulting with the crew chief and subcontractors.

**6. Contracts § 21.2 — contract price for house — no offset for "callback" items**

In an action to recover under a cost plus contract for the construction of a house, the trial court did not err in failing to allow defendant an offset for certain incomplete items disclosed by the evidence, such as light fixtures, cabinet work, sliding doors and screens, on the ground that they were normal "callback" items which plaintiff was not required to perform because defendant had breached the contract by refusing to pay plaintiff for its work.

**7. Contracts § 21.2 — construction price of house — offset for defective drainage system**

In an action to recover under a cost plus contract for the construction of a house, the trial court's award to defendant of an offset of $300 for a defective drainage system was supported by the evidence and was therefore conclusive on appeal, although defendant presented evidence that the cost of remedying the problem caused by the system was between $12,000 and $18,000. Furthermore, the court's allowance of $150 for a leaking chimney and $150 for exposed wires and pipes was supported by defendant's own evidence.

APPEAL by defendant from *Griffin, Judge.* Judgment entered 16 May 1981 in Superior Court, CHATHAM County. Heard in the Court of Appeals 31 August 1982.

Plaintiff commenced this action on 5 July 1979 by the filing of a complaint alleging defendant's breach of a construction contract entered into by the parties on 21 October 1977. The contract called for plaintiff to construct a customized residential dwelling for defendant and for defendant to pay plaintiff its costs associated with the project, estimated to be $65,000, plus 12.5 per-

cent. Plaintiff alleged that although it had completed the work which. it contracted to do, defendant had failed to pay plaintiff the entire amount owing under the contract. Plaintiff prayed judgment in the amount of $35,163.89 plus interest.

In his answer, defendant admitted execution of the contract and his refusal to pay the amount demanded by plaintiff. As a defense and counterclaim, he alleged that plaintiff had breached the contract by, among other things, failing to provide him with monthly statements detailing expenditures to date and failing to complete the project within 180 days, as required by the contract. Defendant requested damages of $35,000 as a result of plaintiff's alleged breach of the contract.

In a reply to defendant's counterclaim and an amended complaint, plaintiff denied the allegations of the counterclaim and asserted that it had substantially complied with the provisions of the contract requiring monthly statements and completion of the project within 180 days and that defendant had waived any stricter compliance with the monthly statement requirement. Defendant denied these allegations in his answer to the amended complaint.

On 31 July 1980, after discovery by the parties, defendant filed a motion for summary judgment on the ground that plaintiff was not licensed as a general contractor during the majority of the construction period and was therefore barred from recovering under the contract. The motion was denied.

Following a trial without a jury, judgment was entered in plaintiff's favor in the amount of $31,105.95 plus interest, for a total of $36,055.41. This amount reflected a setoff of $600 for the costs of remedying defects in the work performed by plaintiff. Defendant appealed.

*Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, by James C. Fuller, Jr., for plaintiff-appellee.*

*Powe, Porter and Alphin, by Charles R. Holton and Laura B. Luger, for defendant-appellant.*

HILL, Judge.

[1] Defendant first assigns error to the trial court's rejection of his licensing defense, a defense raised for the first time in defend-

ant's motion for summary judgment and reasserted by defendant at trial in a motion to dismiss. The court rejected the defense on two bases: that it was not properly raised because defendant never asserted it in his pleadings or amended pleadings; and that, even if properly raised, it should be rejected because plaintiff was licensed at the time it entered into the contract with defendant and substantially complied with the licensing statute. Defendant assigns error to both of these conclusions by the court.

G.S. 87-1, prior to its amendment in 1981, defined "general contractor" as follows:

> For the purpose of this Article, a "general contractor" is defined as one who for a fixed price, commission, fee or wage, undertakes to bid upon or to construct any building . . . or structure where the cost of the undertaking is thirty thousand dollars ($30,000) or more and anyone who shall bid upon or engage in constructing any undertakings . . . above mentioned in the State of North Carolina costing thirty thousand dollars ($30,000) or more shall be deemed and held to have engaged in the business of general contracting in the State of North Carolina.

There is no dispute in this case that plaintiff, by contracting with defendant and undertaking to construct a house for him at a price exceeding $30,000, was a "general contractor" and engaged in the business of general contracting in this State within the statutory definition. Plaintiff thereby became subject to the licensing provisions of G.S. 87-10. The rule is well established in North Carolina that unless a general contractor has substantially complied with the licensing requirements of G.S. 87-10, it may not recover against the owner either under its contract or in *quantum meruit.* *Builders Supply v. Midyette,* 274 N.C. 264, 162 S.E. 2d 507 (1968); *Holland v. Walden,* 11 N.C. App. 281, 181 S.E. 2d 197, *cert. denied,* 279 N.C. 349, 182 S.E. 2d 581 (1971).

Failure to be properly licensed is an affirmative defense which ordinarily must be specifically pleaded. G.S. 1A-1, Rule 8(c); *Roberts v. Heffner,* 51 N.C. App. 646, 277 S.E. 2d 446 (1981). However, "the nature of summary judgment procedure (G.S. 1A-1, Rule 56), coupled with our generally liberal rules relating to amendment of pleadings, require that unpleaded affirmative defenses be deemed part of the pleadings where such defenses

are raised in a hearing on motion for summary judgment. *Bank v. Gillespie*, 291 N.C. 303, 230 S.E. 2d 375 (1976)." *Cooke v. Cooke*, 34 N.C. App. 124, 125, 237 S.E. 2d 323, 324, *disc. rev. denied*, 293 N.C. 740, 241 S.E. 2d 513 (1977). *Accord Furniture Industries v. Griggs*, 47 N.C. App. 104, 266 S.E. 2d 702 (1980). The trial judge erred in rejecting the licensing defense as being improperly raised. The error was not prejudicial, however, because we conclude that based upon the evidence presented plaintiff substantially complied with the licensing provisions of G.S. 87-10.

[2]   The evidence discloses that at the time the contract was executed on 21 October 1977, plaintiff was duly licensed as a general contractor. Plaintiff commenced work under the contract immediately thereafter by clearing and grading the site and the one-half mile roadway leading to the site, placing gravel on the roadway, consulting with defendant, preparing "working drawings" to expedite work by the subcontractors, negotiating with subcontractors and suppliers and purchasing materials. Due to unusually heavy rainfall in November and December 1977 and a severe ice storm in January 1978 requiring reclearing and retopping of the roadway, actual construction of the house did not commence until March 1978. Plaintiff left the job in early October 1978, and defendant moved in immediately thereafter. Plaintiff's general contractor's license expired on 31 January 1978, at which time approximately 10 percent of the work required under the contract had been done. David Robert, plaintiff's secretary-treasurer, inadvertently failed to file a renewal application until October 1978. Plaintiff's license was renewed on 11 October 1978, immediately after plaintiff filed its renewal application, renewal fee and a late filing fee. Plaintiff remained stable in terms of financial condition, managing officers, composition and nature of the business and all other matters relevant to its license during the entire period of construction under the contract. In particular, Runyon C. Woods, who passed the written examination for building contractors on 12 July 1975 with a score of 96 out of 100 (the minimum passing score being 70), thereby qualifying plaintiff for a general contractor's license, remained a full time employee and managing officer of plaintiff throughout the construction period.

The trial court made findings based upon this evidence in support of its conclusion that plaintiff substantially complied with

the licensing statute. Defendant disagrees with the findings regarding plaintiff's stability during the construction period, but they are clearly supported by the evidence.

"The purpose of Article I of Chapter 87 of the General Statutes . . . is to protect the public from incompetent builders." *Builders Supply v. Midyette, supra,* at 270, 162 S.E. 2d at 510-11. When a general contractor has substantially complied with the licensing provisions therein such that the protective policy has been realized, no purpose is served in denying that contractor the right to recover upon its contract. *See Holland v. Walden, supra.* The question thus becomes: What constitutes "substantial compliance" with the licensing provisions such that a contractor may maintain an action upon its contract?

Plaintiff maintains that possession of a valid license at the time of entering the contract alone constitutes "substantial compliance" and that a subsequent lapse of the license during the construction period is irrelevant. Plaintiff relies upon our decision in *Construction Co. v. Anderson,* 5 N.C. App. 12, 168 S.E. 2d 18 (1969), where we affirmed the trial court's dismissal of a contract action brought by a general contractor who was not licensed at the time of entering the construction contract. We stated in our opinion in *Construction Co. v. Anderson, supra,* that the time of entering the contract is of great significance since that is the time when the owner must decide whether the contractor is sufficiently competent to perform the work. Nevertheless, we decline to hold, and the facts of this case do not require that we decide, that mere possession of a valid license at the moment of contracting, regardless of what transpires thereafter with regard to the license, constitutes "substantial compliance" with the licensing statute.

Article I of Chapter 87 clearly contemplates that a contractor should be licensed at the time of contracting and during the construction period. G.S. 87-10, prior to its 1981 amendment, authorized the holder of a general contractor's license to "engage in the practice of general contracting"; and G.S. 87-1 defined one who is "engaged in the business of general contracting" as "anyone who shall bid upon or engage in constructing" any building or structure costing $30,000 or more. Thus, one who is *engaged in*

*construction* of certain structures costing more than $30,000 requires a general contractor's license. We noted in *Construction Co. v. Anderson, supra,* that in addition to lacking a license at the time of contracting, the builder never possessed a valid license at any time during the construction. In contrast, the builder in *Holland v. Walden, supra,* although unlicensed at the time of contracting, procured a license shortly thereafter and remained licensed until completion of the project, constituting 88 percent of the work required under the contract.

As in *Holland,* plaintiff did not possess a valid license at all times contemplated by the statute. Nevertheless, as in *Holland,* the protective policy of the statute was realized by plaintiff's substantial compliance with the licensing provisions. The facts which lead us to this conclusion are as follows: plaintiff was licensed at the significant moment of contracting; plaintiff's license lapsed through inadvertence, not as a result of incompetence or disciplinary action by the licensing board; plaintiff's license was renewed immediately upon its filing of a renewal application and fees; and plaintiff's financial condition and composition, particularly the involvement of Runyon C. Woods, plaintiff's chief designer, carpenter and construction supervisor who qualified plaintiff for its general contractor's license by passing the required written examination, remained unchanged during the period plaintiff was not licensed. Although plaintiff was not licensed for 90 percent of the construction period, the factors listed above, particularly the reason for the license lapse and the automatic renewal thereof, confirming plaintiff's continued competence and responsibility, persuade us that the protective purpose of the licensing statute has been satisfied such that plaintiff should not be barred from recovering under its contract with defendant.

[3] Defendant next assigns error to the trial court's conclusions that plaintiff substantially performed its obligations under the contract to provide defendant with regular monthly statements and to complete the project in 180 days. The pertinent contract provisions state as follows:

> The Builder will provide the Owner with regular statements at least once a month before the *15th* day of each month detailing expenditures to that date with a full explanation of

Barrett, Robert & Woods v. Armi

any variance from the attached plans and specifications . . . in order to keep the costs in line with the attached projected budget.

. . . .

. . . The Builder shall complete all work to be performed under the terms of this Contract within 180 days from the date hereof, barring acts of God, bad weather or other unforeseen circumstances beyond the Builder's control.

In support of its conclusion that plaintiff had substantially complied with the monthly statement requirement, the court found that plaintiff had provided statements to defendant on 26 April, 30 May, 12 July and in August and September 1978. The first statement was not provided until five months after execution of the contract because, due to severe and unusual weather and soil conditions which delayed construction, the expenditures to that date were minimal. Plaintiff did not provide a statement to defendant in June 1978. The July 1978 statement reflected plaintiff's expenditures to date but did not reflect some invoices received but not yet paid by plaintiff. These outstanding obligations were reported to defendant orally in July and were reflected in the August 1978 statement. In September, plaintiff sent defendant a written statement of costs in anticipation of closing.

These findings are completely supported by the evidence and, in our opinion, support the court's conclusion of substantial compliance by plaintiff with the monthly statement provision. Indeed, defendant's main argument on appeal appears to be, not that he was provided with untimely or an insufficient number of monthly statements, but that one of those statements, in July 1978, was so inaccurate as to mislead him as to the cost of the project. The record does reveal that the July statement reflected only a 7 percent cost overrun, whereas the final accounting revealed a cost overrun of over 30 percent. Nevertheless, the July statement did reflect expenditures to date, as required by the contract, and defendant was informed shortly thereafter of the outstanding invoices not disclosed in the statement. The record further discloses that after being so informed, defendant continued his previous course of selecting the most expensive materials and construction methods for his house. On this ground

the court found, and we agree, that defendant was not harmed by plaintiff's failure to comply more strictly with the monthly statement requirement.

[4] With regard to the timeliness of plaintiff's performance under the contract, the court found that plaintiff had complied with the contract provision in that the delay beyond 180 days was caused by five months of unusually severe weather, defendant's numerous change orders and defendant's detailed involvement in the project, constituting "unforeseen circumstances beyond the builder's control." Defendant disagrees with these findings on the ground that bad weather and change orders are foreseeable circumstances in any building project. The evidence at trial was abundant, however, that the weather during the first five months of the contract period was unusually severe and that the extent of defendant's involvement in the project and the number of changes required by him were far beyond the norm. The crew chief for defendant's house testified that he quickly learned that he could not make ordinary on-the-job decisions without defendant's approval because defendant had strong and unpredictable opinions about every detail of the house. He also testified that defendant often required him to change or redo portions of construction which defendant decided should be done differently for aesthetic purposes, and had him mock up interior partitions so that defendant could decide whether they were aesthetically acceptable. The evidence as a whole supports the court's findings and conclusion that the six month delay in completion of defendant's house fell within the absolving clause of the contract provision.

[5] Defendant's final assignments of error concern the amount of damages awarded to plaintiff on the ground that the court's findings as to plaintiff's costs associated with the project and as to the cost of curing defects in plaintiff's work are not supported by the evidence.

With regard to plaintiff's costs, the court found them to be $82,938.62, including 27 weeks of the salary of Runyon Woods. The court's finding is based upon invoices, cancelled checks and time records submitted by plaintiff at trial and the testimony of plaintiff's managing officers. Defendant contends that these cost figures are inaccurate in that they include the salary of Runyon

Woods for approximately six weeks after he had been removed from the job at defendant's request and include certain "changes and extras" that were not, in fact, changes from the original plans and specifications. We find no error.

The contract specifically provided that plaintiff's costs would include the salary of Runyon Woods "for the duration of construction as overseer." Although Woods was relieved of responsibility for dealing with defendant in mid-August, following an argument between Woods and defendant concerning defendant's withholding of payments to plaintiff and plaintiff's delayed completion of the house, Woods continued to oversee the job by consulting with the crew chief and subcontractors. Consequently, plaintiff continued to carry his salary as a charge to defendant until the end of the job. Further, when Woods ceased dealing directly with defendant, Gerald Barrett, another principal in plaintiff, took over this function; however, plaintiff did not charge Barrett's salary to defendant during this period. Finally, plaintiff did not charge defendant for Woods' salary during the "down time" caused by the severe weather even though Woods expended considerable time on the project during that period. The court's inclusion of Woods' salary in plaintiff's costs was justified.

Defendant does not contend that the invoices and cancelled checks submitted by plaintiff are inflated. He merely argues that some of the items reflected therein, which cost more than estimated in the plans and specifications, were not changes or extras but were anticipated in the estimated price of $65,000. Regardless of the status of the items, defendant was obligated to pay for them under the terms of his "cost plus" contract with plaintiff. We conclude that the trial court's determination of plaintiff's costs for the project is amply supported by the evidence.

[6] The trial court allowed defendant an offset of $600 based upon its findings as to the costs of remedying three items of defective workmanship: exposed wires and pipes, a leak around the chimney and water accumulation in the heat ducts and around the house after rain storms. Defendant contends that the amount of the offset was arbitrary and not supported by the evidence. In particular, defendant argues that he should have been awarded damages for numerous incomplete items disclosed by the evidence, such as light fixtures, cabinet work, sliding doors and

screens. The court declined to include these items in the setoff on the ground that they were normal "call back" items which plaintiff was not required to perform because defendant had breached the contract by refusing to pay plaintiff for its work.

The evidence discloses that in early August defendant began withholding payment from plaintiff and that in late September defendant failed to attend three scheduled closings. Plaintiff nevertheless continued to perform under the contract and substantially completed the house prior to ceasing construction, as evidenced by the fact that defendant moved in immediately thereafter. On these facts, the court correctly declined to charge plaintiff for its failure to perform the call back work. Further, defendant presented no evidence as to the cost of performing such work.

[7] Defendant also failed to present evidence as to the cost of remedying other items of alleged defective workmanship, such as acid stains on woodwork, cracks in interior woodwork, inadequate trim work on a hideaway bed and defective cabinet doors. The court therefore correctly declined to award compensation for these items. As for the defective work for which defendant was awarded compensation, defendant contends that the amount awarded was arbitrarily selected in view of his evidence that the cost of remedying the water accumulation problem alone was between $12,000 and $18,000. Defendant did present evidence that to cure that defect, the stone floor in the house would have to be ripped up in order to locate the lowest point in the heating ducts so that a drainage system could be installed. Defendant's estimated cost of repair was therefore based upon assumptions that there was no drainage system already in place and that the lowest point in the duct system could be located only by extensive exploration. Plaintiff offered rebuttal testimony by Runyon Woods that an extensive drainage system was already in place, but most likely had become clogged, and could be cleared at a cost of not more than $300. Woods further testified that he knew where the lowest point in the heating duct system was, so that even if a new drainage system had to be installed, the cost of doing so would be no more than $1,000. As the trier of fact, the court had the right to weigh all of the competent evidence before it and to resolve any inconsistencies or contradictions in the evidence. *See Hodges v. Hodges,* 257 N.C. 774, 127 S.E. 2d 567

(1962). The court's award of $300 for the defective drainage system was clearly supported by the evidence and is therefore conclusive on appeal. *See Construction Co. v. Crain and Denbo, Inc.*, 256 N.C. 110, 123 S.E. 2d 590 (1962). The awards of $150 for the leaking chimney and $150 for the exposed wires and pipes are supported by defendant's own evidence.

The decision of the trial court is

Affirmed.

Judges VAUGHN and JOHNSON concur.