### In re LAKE PROVIDENCE PROPERTIES, INC., Debtor.

### PAVING EQUIPMENT OF CAROLINA, INC. d/b/a Mecklenburg Paving, Inc., Plaintiff,

### v.

### LAKE PROVIDENCE PROPERTIES, INC., and James E. Wall, Sr., Chapter 11 Trustee for Lake Providence Properties, Inc., Defendants.

Bankruptcy No. 93–30064.
Adv. No. 93–3255.

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

Sept. 28, 1993.

---

William G. Robinson, Charlotte, NC, for plaintiff.

Robert L. Lindsey, Jr., Charlotte, NC, for defendant/debtor Lake Providence Properties, Inc.

J. Craig Whitley, Charlotte, NC, for defendant James E. Wall, Trustee.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

GEORGE R. HODGES, Bankruptcy Judge.

THIS MATTER came before the Court for trial on July 30, 1993. William G. Robinson appeared on behalf of the Plaintiff, while J. Craig Whitley represented the Defendant Trustee and Robert Lindsey, the Debtor. Although, procedurally the action covers a number of legal theories, in essence this action involves a determination of a claim filed against the Estate, by the Plaintiff Paving Equipment of the Carolinas, Inc., d/b/a Mecklenburg Paving, Inc. ("Mecklenburg Paving"). Mecklenburg Paving originally filed a secured claim against the Chapter 11 Debtor for $1,030,577.43. Objections to that claim have been filed by the Debtor, Lake Providence Properties, Inc. ("LPP" or "Debtor"), and the Trustee James E. Wall, Sr. ("Trustee"). The Defendants contend that Mecklenburg Paving breached its prepetition contract with the Debtor and is not entitled to recovery and additionally challenge the amounts asserted in that claim. Additionally, the Trustee has argued that any claim of the Plaintiff is in the nature of equity, not debt and is subordinate to other claims in the Bankruptcy case. Because the determination of this claim could significantly affect the Bankruptcy reorganization, this matter was tried on an expedited basis with the consent of the parties.

Technically, this action was commenced by Plaintiff filing a lien perfection action in State Court pursuant to a consensual grant of relief from stay so that it might comply with technical requirements for perfecting a state law statutory lien. That action was then removed to this Court to be tried with a claim objection to be filed by the Debtor. In the interim, the Court appointed Wall as Trustee to operate the Debtor's business. Wall was added as a defendant to this action by consent.

Defendant LPP then filed its Objection to the proof of claim and a Counterclaim on June 24, 1993. Mecklenburg Paving's Response to the Counterclaim was filed on July 6, 1993. The Trustee filed an Answer and his Counterclaims on July 6, 1993, and LPP supplemented its earlier answer and filed an Answer dated July 8, 1993.

At the conclusion of the trial evidence, the Defendants were granted leave to verbally amend their pleadings to raise N.C.G.S. 87–1 (Mecklenburg Paving's lack of a general contractor's license at all times pertinent to this case) as an additional claim objection, and the Trustee's position that Plaintiff's claims are equity, and not debt. Additionally, Plaintiff was granted leave to amend its proof of claim from a secured debt to claim an equity interest in the Debtor instead. All of the aforesaid allowed amendments are hereby deemed to have been made, and it is not necessary for any party to file any further written documents with the Court to effectuate said amendments.

*FINDINGS OF FACT*

1. LPP is a North Carolina Corporation whose business is the development and sale of residential real estate in Mecklenburg and Union Counties, North Carolina. The Debtor owns and at the times in controversy was

developing three subdivisions known as Lake Providence North, Providence Hills, and Valley Ranch. The Debtor's President and sole shareholder is William H. Nolan, III.

2. Mecklenburg Paving is a paving contractor and a North Carolina Corporation that also does business in Mecklenburg and Union Counties, North Carolina. Robert Yon is the President and owner of the Plaintiff.

3. In the fall of 1991, LPP was undertaking development of its Providence Hills subdivision, and building a dam and 60–acre lake at its Lake Providence North subdivision. Although little more than the rough grading had been done at Providence Hills and only a minor portion of the 700' dam at the Lake had been built, LPP was running out of money. Nolan therefore approached Mecklenburg Paving, a paving contractor who had worked for the Debtor in the past, about completing construction of the Providence Hills infrastructure.

4. The Debtor proposed that it would provide the land and sell the developed lots in Providence Hills, if Mecklenburg Paving would construct and pay the costs of developing the subdivision. In return, Mecklenburg Paving would receive part of the sales proceeds as lots were completed and sold. The Debtor's obligations to Mecklenburg Paving were to be secured by a Deed of Trust on Providence Hills.

5. These discussions led to a letter of intent between the parties entitled Memorandum of Understanding, dated October 25, 1991, and anticipating a contract between the parties for the completion of this work.

6. Although the Memorandum was not itself a binding contract, the parties were familiar with one another and Mecklenburg Paving began work on Providence Hills on a handshake basis. Although not contemplated by the Memorandum, the work undertaken also included five construction projects unrelated to Providence Hills and the dam in the Debtor's other subdivisions, including road grading in Lake Providence North and Valley Ranch and the construction of a second small dam in Valley Ranch (collectively referred to as the "Reed Fallon projects").

7. Under the parties working arrangement, Mecklenburg Paving oversaw and coordinated the building of these improvements, although Nolan was on the site regularly. Plaintiff planned and oversaw the work, bought materials, and hired subcontractors and engineers for portions of the project. On other parts of the projects, such as the paving, it provided the work itself. Plaintiff's employees regularly oversaw and coordinated construction work done by others.

8. Under the arrangement, in doing the construction Mecklenburg Paving employed both its machinery as well as a dozer, loader, excavator, skidder and dump truck belonging to the Debtor.

9. At the time it was brought in, Mecklenburg Paving was not aware and had not told by the Debtor that, the Debtor had not obtained subdivision approval for part of Providence Hills.

10. Shortly after the Memorandum was signed, Mecklenburg Paving also agreed with the Plaintiff to complete construction of a 700' earthen dam at Lake Providence North. This agreement was reflected by an Explanation Concerning Memorandum of Understanding dated November 21, 1991 ("Explanation") (P–2). Mecklenburg Paving's responsibility for this work was contingent upon Debtor's continued provision of equipment and capped at a cost of $65,000, with any overruns to be borne by Lake Providence.

11. The dam work agreement was prompted by running dispute with the Lake Providence North Landowners. Nolan had over a period of several years sold lots in Lake Providence North to individuals upon the promise that the Debtor would build a 60–acre lake in the subdivision. Prior to contracting with Yon, Nolan had signed a Consent Judgment in favor of the lot owners in which he promised to have the dam and Lake completed by a specified date. By November of 1991, however, only a small part of the construction, some grading, had been completed, and the dam was largely unbuilt. Nolan was facing being jailed by the Superior Court for contempt.

12. Nolan brought Yon into both projects because he lacked the financial ability to complete construction himself. Mecklenburg Paving offered a "no money down" way for LPP to develop these properties. Yon's entry into the dam project also added credibility to Nolan's assertions that the dam would be finished and kept him out of jail.

13. However, after the State Court hearing, instead of completing the Dam as promised, Nolan instructed Plaintiff to work on Providence Hills and complete the Reed/Fallon projects instead. Therefore, little or no work was done on the dam by Mecklenburg Paving from November 1991 to April of 1992, apart from piling up dirt to make it appear to the lot owners that work was proceeding.

14. By the Spring of 1992, Plaintiff was concerned that a final contract for the venture had not been prepared and it had not received the promised security for its work. Mecklenburg Paving insisted that it could not go forward without these, sparking a week of meetings between Yon, Nolan and Nolan's attorney. These resulted in the "Joint Venture Agreement" (P–3) dated March 31, 1992.

15. The Joint Venture Agreement required, among other things, that Mecklenburg Paving complete development of the Providence Hill and LP North lake projects at its expense within certain time parameters. This included constructing the Providence Hills subdivision streets, curbs, and sidewalks, the water and sewer systems; building two small lakes and to erect a brick fence along the main highway. As to Lake Providence North, the Joint Venture Agreement called for Plaintiff to complete the Lake and dam. A deadline was set for August 1, 1992. Mecklenburg Paving also forgave monies currently owed it by the Debtor for the work previously performed.

16. Under the Joint Venture Agreement, the Debtor's obligations were to provide the land, allow Plaintiff to use its equipment, and to sell the finished lots. From those sales, Mecklenburg Paving would receive $1,680,-750.00 paid in installments of $20,497.00 per lot and without interest. Mecklenburg Paving's payments under the Joint Venture Agreement were secured by a Note dated March 3, 1992 (P–5), and a Deed of Trust (P–6) on the 83 Providence Hills subdivision lots.

17. In practice, Mecklenburg Paving's services went beyond the letter of the written contract, including in addition to working on projects other than the dam and Providence Hills, making Nolan loans to pay for his living expenses.

18. In April 1992, the dam having not been completed, Nolan was jailed by the Superior Court. This prompted Nolan to have Mecklenburg Paving begin work on the dam. From this point forward, Mecklenburg Paving worked alternatively on the dam or on Providence Hills.

19. As of August 1992, neither the dam, nor Providence Hills subdivision were complete. Of the 83 Providence Hills lots Mecklenburg Paving was to complete, only one or two had been completed and sold by August, 1992. As anticipated by the Joint Venture Agreement, a superior secured creditor, Branch Bank & Trust ("BB & T") received the sales proceeds from these. As to the dam, neither party had ever built a dam before, certainly not one of this size, and the cost was greatly exceeding than the $65,000 originally envisioned.

20. Not surprisingly, some of this delay in completion was due to the financial difficulties both companies were experiencing. The Providence Hills project was much larger than any job previously undertaken by Mecklenburg Paving, and it had envisioned financing some 75% of the construction through its banking relationship with RHNB. However, when RHNB learned of Nolan's interest in the subdivisions, it refused to lend to Yon. Alternate financing through a private businessman fell through in like manner. Loans made to the Debtor by Branch Bank & Trust ($35,000) and Elliot Schwartz ($300,000 net) proved insufficient. By August of 1992, both businesses were struggling to complete the projects and to survive. The lack of funding meant that projects were not always done in the most efficient manner, with pulloffs being made to work on small jobs so these could be closed to get cash in the business. Mecklenburg Paving also occasionally was forced to pull off to pave drive-

ways for third parties to generate operating revenues.

21. Because of these problems, on August 21, 1992, the parties modified the Joint Venture Agreement by Modification Agreement to extend the completion deadlines of the projects and the maturity dates of the Note and Deed of Trust. A requirement was added that the Debtor sell ten lots before the end of each succeeding year, with the proceeds to be paid to Mecklenburg Paving. All other terms of the Joint Venture Agreement remained in full force and effect.

22. By the fall of 1992, the projects were still not complete and the Superior Court again jailed Nolan for contempt. This prompted a dawn to dusk effort by Mecklenburg Paving to finish the Lake. By November, a temporary impoundment order had been secured, and upon completion of the flood spillover causeway, the Lake would be complete. The parties were even more desperate for money, and were at odds with one another, however.

23. In November, Nolan had told an employee, Dan Martin, that if Mecklenburg Paving defaulted on its contract he would come out ahead $250,000 by not having to pay Plaintiff for its work. Matters reached a head in a dispute over the use of the proceeds from a lot sale. Nolan asked Yon to subordinate Mecklenburg Paving's lien so that he could use the money for personal expenses. Yon wanted to use the money to purchase rip rap for the causeway. In a telephone conversation between the parties, Nolan told Yon to get off the job. Mecklenburg Paving accordingly pulled off the projects.

24. It is undisputed that the projects were not complete at the time of the pull off. On the Lake Providence North dam project, the dam causeway had not been constructed, a valve had yet to be installed and the Lake was not filled. At Providence Hills several streets had not been completed and a substantial amount of curbing, guttering and grading remained to be done. Several subdivision streets were totally unpaved. No sidewalks had been built. The sewer pump station had not been installed, two small lakes under the Duke power right way had not been built, a six foot brick fence running the length of McKee Rd. had not been started, and the brass signs at the entrance, landscaping and entrance lighting were unfinished. Necessary permits to operate the water and sewer system and to complete the subdivision had not been obtained.

25. As by the testimony of Fred Gore, an engineer who reviewed the site in February, 1992, complete Providence Hills (functionally, not by the terms of the Joint Venture Agreement) was anticipated to cost $600,000.

26. Since his appointment, the Trustee has expended some $165,000–170,000 to complete the dam. The Lake has not yet been approved by the government regulating bodies so that it may be filled.

27. At present, several construction expenses for the projects, primarily subcontractors claims, are still unpaid. Winchester Grading, is owed $14,000 for work done and has filed a secured claim against the Estate Donald Thomas apparently claims $33,000 on a lien claim. There are doubtless other construction costs that were not paid.

28. The Debtor filed Chapter 11 on January 14, 1993, and briefly attempted to complete the Lake Providence lake and the Providence Hills subdivisions. On April 29, 1993, the Trustee was appointed by this Court at the request of creditors and lot owners.

29. Since that date, the Trustee has undertaken to complete these projects. Providence Hills has not yet been finished, but the Court has approved a contract for the sale of most of the lots therefrom to Wieland Builders. That sale, which has not yet closed, requires the Trustee to finish the improvements at the subdivision as a condition precedent. The estate lacks unencumbered liquid assets. Completion of these projects, while proceeding through the use of loans and work performed on credit, is still as yet uncertain.

30. On March 30, 1993, Plaintiff filed a secured proof of claim against the Debtor's Estate, alleging a debt of $1,030,577.43 net [$1,680,750.00 gross], the amount of which it amended at trial to $1,194,715.98. This claim breaks down as:

| | | |
|---|---|---:|
| 1. | Storm Drainage: | $ 25,727.32 |
| 2. | Grading & Landscaping | $ 291,663.52 |
| 3. | Water & Sewer | $ 128,101.06 |
| 4. | Stone & Site Work | $ 88,957.00 |
| 5. | Dam | $ 484,393.68 |
| 6. | Miscellaneous | $ 162,723.40 |
| 7. | Loans/corporate | $ 13,150.00 |
| | Total | $1,194,715.98 |

31. Plaintiff asserts a secured claim by the Note and Deed of Trust on Providence Hills, and by a mechanic's lien against the Lake Providence North lake and dam.

32. Plaintiff has never, at any time, had the general contracting license required by North Carolina General Statutes Chapter 87, Article 1.

33. The cost of the work undertaken by the Plaintiff exceeded $45,000.

34. Prior to the subject relationship between Plaintiff and Debtor, Debtor had sold various lots in both its Providence Hills Subdivision and in its Lake Providence Subdivision to individuals who were unable to build and use the lots pending completion of roads and infrastructure in Providence Hills and the lake in Lake Providence subdivision.

## CONCLUSIONS OF LAW

1. Based upon the record, it is the Court's conclusion that the obligations between the Mecklenburg Paving and LPP are in the nature of a joint venture, essentially, a partnership between the Debtor and Mecklenburg Paving. That claim, as an equity interest, should be subordinate to all other creditor claims in this case under Bankruptcy Code Section 510 and North Carolina law. Equity is entitled to payment only after all allowable debts are satisfied. However, due to the Deed of Trust security and for reasons set forth herein, the Court also concludes that Mecklenburg Paving's claims, to the extent allowed, should be superior in priority and be paid ahead of the Debtor's and its owner, Mr. Nolan's, equity interest in Providence Hills.

2. Many of the facts of this case have been disputed by the parties and conflicting testimony has been received on a number of points. In reaching a judgment, evaluating the credibility of the witnesses has been necessary. After observing the witnesses on the stand and in the courtroom and in particular the Plaintiff's President, Mr. Yon, the Court finds Yon's testimony to be believable and reasonable, and generally accepts his testimony where it conflicts with that of others. In particular, the Court concludes Mr. Yon's testimony was more credible than contradictory testimony of Bill Nolan and generally accepts the former where the two conflict.

3. The Debtor and Trustee argued at trial that Mecklenburg Paving was acting as a general contractor and was required to have a contractor's license, which it is undisputed that it did not. Their contention is based upon N.C.G.S. 87–1 and a long line of cases which hold that an unlicensed general contractor may not recover for services provided, either by contract or under the theory of quantum meruit. *See, 301 East Seventh Street Ltd. Partnership v. Gellman Corp.,* 124 B.R. 687 (W.D.N.C.1991); *Barrett, Robert, & Woods, Inc. v. Armi,* 59 N.C.App. 134, 296 S.E.2d 10, *cert. denied,* 307 N.C. 269, 299 S.E.2d 214 (1982); *Mill–Power Supply Co. v. CVM Assocs.,* 85 N.C.App. 455, 355 S.E.2d 245 (1987); *Phillips v. Parton,* 59 N.C.App. 179, 296 S.E.2d 317 (1982), *aff'd,* 307 N.C. 694, 300 S.W.2d 387 (1983).

4. The North Carolina general contractors licensing law, N.C.G.S. Section 87–1, defines a "general contractor" as:

> any person or firm or corporation who for a fixed price, commission, fee, or wage, undertakes to bid upon or construct or who undertakes to superintend or manage, on his own behalf or for any person, firm, or corporation that is not licensed as a general contractor pursuant to this Article, the construction of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking is $30,000.00 or more.

(At the time of the present contract was executed by the parties, the threshold amount was $45,000.)

5. It is undisputed that Mecklenburg Paving nor Yon have ever held a contractor's license, nor has the Debtor or its President, Bill Nolan. It is also true that the work to be performed by Mecklenburg Paving exceeds $30,000. It is also true that the services undertaken by Mecklenburg Paving in-

cluded services which are performed by a contractor, including hiring and supervising subcontractors, ordering materials, performing construction services, etc. However, the Court, concludes that the Plaintiff was not acting as a general contractor under NCGS 87–1, but instead was an owner, and therefore is not subject to licensing under the statute.

6. Section 87–1 excepts from its coverage "any person or firm or corporation who constructs a building on land owned by that person, firm, or corporation when such building is intended for use by that person, firm or corporation after completion." N.C.G.S. Section 87–1 (1989). Under the working agreements between the Debtor and Mecklenburg Paving, the latter was essentially an owner or partner/investor in these subdivision projects. The relationship between the two was that of two joint venturers, not an owner and his contractor. Plaintiff therefore fits under the "owner's exemption," and is not subject to licensing under N.C.G.S. 87–1.

7. In so ruling, the Court distinguishes the case of *Roberts v. Heffner,* 51 N.C.App. 646, 653, 277 S.E.2d 446 (1981), cited in the Trustee's trial brief for the proposition that the owner's exemption is not available to an owner who does not expect to ultimately occupy the completed premises. In *Roberts,* the Plaintiff, an unlicensed general contractor, had contracted to build a house for a third party upon the contractor's land. When completed, the residence and lot were to be conveyed to the purchaser. When a dispute arose, and the contractor tried to enforce his contract, the buyers refused to pay citing Section 87–1. The N.C. Court of Appeals upheld the buyer's refusal to pay, ruling that "a builder, who is unable or unwilling to obtain a general contractor's license from the State of North Carolina, should not be allowed to thwart the plain intent of § 87–1 by the artifice of contracting to build a residence for another on the builder's land." *Id.* Although the contractor argued exemption due to his ownership of the land, the Court of Appeals concluded "ownership of the land has nothing to do with the purpose of the prohibition." *Id.*

8. By contrast, in the present case, the construction services being performed by Mecklenburg Paving were essentially done for the joint venture, the owner, and not for a third party purchaser. What was to be sold by Lake Providence were lots. Mecklenburg Paving was not building the lots for third party purchasers, he was building roads and sewers and dams and other things incidental to the development of the subdivision, for the benefit of his joint venture. Thus, the *Roberts* case is inapposite.

9. There are a number of other facts which make the Court conclude this was not an owner/general contractor relationship. For example, apparently both Mr. Nolan and Mr. Yon paid money to the dam engineer for his work. You would not expect a contractor to pay the engineer if this was a traditional kind of general contractor situation. This is an owner's function. In like measure, the services to be provided by Mecklenburg were not performed for a set contract amount, with a specific price set for specific work to be performed. Rather, the construction work was done for a flat price, $20,500 per lot, contingent upon, and paid only if lots were sold. The price was to be paid only from the sales proceeds, and no interest was to accrue on the "debt." This is indicative of a partnership, and not a typical construction contract.

The projects were simply not approached as a contract hiring. The construction work was not bid out by Lake Providence Properties before work started. When it did, Mecklenburg Paving did not keep job tickets on the considerable amount of grading done, or the specific costs of services provided, as one would expect if this were a for hire job. No invoices or requests for payment were sent to the Debtor to advise it of the amount of work done. There is little or nothing in the record from which the Court could find a mutual intent to have a "for hire" relationship. The parties' actions and the way they operated, are consistent with a partnership not an owner/contractor relationship.

10. The treatment of this claim as a joint venture is also supported by the documents between the parties and statements made as the projects went along. As to the former,

both the Joint Venture Agreement and the Modification Agreement declare the relationship between Mecklenburg Paving and the Debtor to be a joint venture and describe in detail a partnership arrangement: The Debtor was to provide the land and sales for the developments, Mecklenburg Paving was to finance and complete the improvements thereon. In March, 1992, when the Joint Venture Agreement was signed, Debtor's counsel in the presence of both Nolan and Yon told them that they should understand that they were in fact partners. There is no indication that either disagreed with this assessment, either at the time or thereafter. When the Modification was entered into in August of 1992, it reiterated the language of the Joint Venture Agreement that this was their arrangement. Finally, Yon testified on cross examination that he considered himself and Nolan partners.

11. Even if the evidence suggested a contract for hire rather than a partnership, the Court questions whether Mecklenburg Paving held sufficient control to qualify as a general contractor. The distinction between a general contractor and a subcontractor or other party is based upon the degree of control exercised by the person over the construction of the entire project. *Mill–Power Supply Co. v. CVM Assocs., supra.* While Yon directed the movement of the construction equipment and Mecklenburg Paving did much of the work performed, it is clear that overall direction of the projects came from Nolan. The work appears to be controlled by Mr. Nolan in the sense that anything he said he wanted done was done, when he said he wanted it done, and where he said he wanted it done. The work was performed at his direction, and even when that direction varied with the terms of the contracts that had been recently drawn and included work not contemplated by those documents.

12. Additionally, the Court gives credence to the equities of this matter and the unfairness that would occur if Mecklenburg Paving were deemed a general contractor. The case annotations in N.C.G.S. 87–1 do not leave much room for concepts of equity. However, this is a Court of equity. If the only relevant consideration in this case was equity, that consideration would require not imposing the penalties of N.C.G.S. 87–1 on Mecklenburg Paving. To do so, would by legal technicality, effectuate the mischief that the Court finds Mr. Nolan was trying to accomplish in the fall of 1992 when he was trying to trigger a default by the Plaintiff. The Court concludes that Nolan was attempting to squeeze the blood out of Mecklenburg Paving and get all the work he could from them, then declare default and get the work for free. That should not be permitted by a Court of equity. There is no evidence that any objection was raised at any time during the course of this work by the Debtor to Mecklenburg Paving not having a license. Finally, one must consider the consequences to the Debtor and Nolan if this work had not been done. Had the dam not been built, and Judge Sitton's Order remained in effect, Mr. Nolan would not have been released from jail. He hardly could have been advantaged by having to build the dam from the jailhouse with a licensed contractor.

13. As to the parole evidence rule and the issue of what the contract was in this case, the four documents (Plaintiff's Exhibits 1–4), are not in the Court's opinion the whole agreement between the parties. Most do not purport to be. None of these agreements fully define the scope of the work to be done by the Plaintiff, and set a price and a time for it to be done. The Court concludes that the only contract here was based upon the parties course of dealing with each other. The parties did not act as if they were bound by the aforementioned written documents. For while the documents specified deadlines for work, the parties usually ignored those deadlines, operating after the expiration of those deadlines and apparently without objection. "Time is of the essence" is stated in several of the agreements, and while Nolan and the Debtor were aware of that, this was never an issue during the course of the construction, and became an issue only when litigation was commenced. For example, the Memorandum of Understanding of October 25, 1991, states "time is of the essence" and the Explanation of November 21 accepts a Court imposed schedule for completion of the Lake. However, by the time of the Joint

Venture Agreement of March 31, 1992, the parties had done almost no work on the dam and had adopted a different deadline for finishing the subdivision (August 1, 1992). When even that date had past, without completion of the projects, the parties set yet another date. In the Modification Agreement of August 26, 1992, a "reasonable time" is granted for completion of the dam. This is simply one of many examples that the written documents do not compose the full agreement of these parties.

14. As to the time of the contract, the Memorandum first stated this in the Fall of 1991. The arrangement was declared a joint venture in March 31, 1992 in the Joint Venture Agreement. However, the Court concludes that is what the parties had from the very beginning in the Fall of 1991. The Debtor was putting up the land and Mecklenburg Paving was going to come do the work and if it had all worked out, and it may yet, then the two would both profit from that. If not, they were not going to profit from it. That is a standard partnership or a joint venture.

15. Although the written documents do not so provide, there was a reasonable expectation of behalf of Mecklenburg Paving that there would be lot sales and income to provide revenue to complete the construction. Again the Court concludes that the written terms of the Agreements were not the full expression of the parties agreement. That there would be some sales before full completion was discussed between the parties. Nolan was aware, but did not tell Yon, of the lack of regulatory approval on some lots in Providence Hills.

16. As to Nolan's effort to induce a default by the Plaintiff, it is apparent from the testimony of Yon and the Debtor's employee Dan Martin and other evidence in the record that a conscious attempt was made by Nolan to cause Mecklenburg Paving to default under these contract documents. Nolan's intent was that the Debtor could then refuse payment for the work already done and essentially get it for free. Nolan told Martin that this was what he was going to do.

17. Nolan's actions in this regard and his telephone conversation with Mr. Yon in November of 1992, wherein he told Mecklenburg Paving to cease work on the property, constitute an anticipatory breach by the Debtor that justified Mecklenburg Paving stopping work. These breaches by the Debtor are further augmented by other acts which would excuse performance by the Plaintiff. For example, information was withheld by Nolan that was relevant and important to Mecklenburg Paving's entry into the joint venture. In particular, Mecklenburg Paving was mislead by Nolan about subdivision approval for some lots to be sold and later about the Debtor's efforts to sell lots.

18. As to the amount of the allowed claim, there is no contract price here, as such, except for the $1.6 million amount stated in the Joint Venture Agreement which all parties agree is inapplicable. Mecklenburg Paving's claim was filed for what it asserts are its actual costs associated with the Debtor's projects. Under the circumstances recited above, and given that the claim is an equity interest, the Court concludes Mecklenburg Paving ought to be entitled to a claim for the cost of the work that it did for the Debtor. The best evidence of the value of the work that was done out there is its cost.

19. The direct evidence, or lack thereof, of these costs was a central issue at trial. The Debtor and Trustee have argued that Plaintiff has failed to demonstrate the sums which it claims are owed, which sums are admittedly evidenced primarily by canceled checks, formula allocations and estimates. The Court concludes, however, that Mecklenburg Paving has adequately documented its claim, given the context in which the work was done. As noted, this was a partnership, not a "for hire" arrangement to be billed on a regular basis, and it is understandable that contemporaneous time records and expense records were not kept. The Plaintiff's estimates appear reasonable under the circumstances; while not absolutely precise, they are sufficiently certain, and take into account the circumstances under which the work was done. These circumstances were not always the best, since Mecklenburg

Paving spent much of its time reacting to Mr. Nolan's requests and directions. The build-out of the project wasn't done on a critical path analysis, but often by putting out what-ever fire happened to be flaring up at that time—running to get a pipe put in at some place the Debtor could close the lot sale, or building a lake on another day so they could get something closed, or even stopping all other work to construct the Dam to get Nolan out of jail.

20. It further appears that where Meck-lenburg Paving used estimates, those are reasonable and appear to agree with the other known figures. For example, Plaintiff does not have exact figures for fuel and labor, but these bear a reasonable relation-ship to the other known costs, and do not seem to be inflated. The estimates also cor-respond to the overall amount of work that was done.

21. Specifically, the Court accepts Meck-lenburg Paving's overhead estimate of 26.5% of costs of goods sold. This appears to be supported by the evidence, by the Court's general knowledge of the operation of busi-nesses in general, and by common sense. There is no other figure that has been sug-gested as an alternative figure and this one appears to be reasonable. There are, howev-er, instances in which overhead is claimed but should not be allowed. Overhead should not be applied to sum expended but not related to construction—specifically to loans and that kind of activity. It is also not appropriate to charge overhead where the bill already includes necessary overhead, for example, in the paving or for work done by third parties.

22. There is contradictory evidence in the record as to the value of the work performed, and whether all of the sums expended by Plaintiff were necessary or whether the work was done in the most efficient manner. That evidence is primarily based upon after-the-fact cost estimates by others in the construc-tion industry. As those witnesses estimates of what it would have taken to do the work, where these conflict with Yon's testimony, the Court accepts Yon's testimony and his documentation over that of these surveyors, engineers, and Mr. Davis. It is too easy to come in after the fact and based upon projec-tions and mathematical calculation declare what something ought to cost. Based on the Court's observation of Yon and its belief in his credibility, the Court is more comfortable with, and relies upon, the testimony of the person who was there doing the work than such second hand estimates.

23. As to the issue of the performance time and quality of work, the Court finds no basis for any deductions or a finding of a breach by Mecklenburg Paving. While there are questions now about how much dirt was moved, how many people worked on the job and on a given day how much they were working on one job as opposed to another, there is no evidence that there was any substantial complaint about timeliness or quality of performance while this project was going on. Any statements that Mr. Nolan may have made to the engineers or state-ments that were contained in their notes, the Court takes as general grousing and bad-mouthing and gives no credibility.

24. As to the quality of the work, some of the criticisms asserted during the trial were again "Monday morning quarterbacking" which the Court finds unpersuasive. Some criticisms stem from currently judging these projects against a standard of perfection that was never the standard when the work was done, nor the expectation of anybody in-volved in the project. An example is the current problems with Providence Hills Drive. Upon its completion by Mecklenburg Paving, that road was inspected by the State and was accepted. The record reflects no complaints by the Debtor about the quality of the construction of that road at the time of its construction. The road apparently was built like it was supposed to be, the testimo-ny and pictures Mr. Gooch notwithstanding. Gooch's testimony about the status of the road today is not persuasive in that the road is not in the condition it was left by Mr. Yon's firm. It has been run over by heavy equipment, dirt has been moved and trucks have crossed things for a number of months now. That it may now be deteriorating does not prove that it was improperly constructed.

25. As to the Trustee's contention that a portion of the sums claimed here by

Plaintiff were advanced by Yon and therefore are not secured claims under the Deed of Trust and other contracts, the Court concludes this was simply a convenience. These monies should be treated like all of the other loans to Lake Providence Properties, as a corporate expense. Yon basically is Mecklenburg Paving and anything that he paid out of his personal checking account was effectively a payment by Mecklenburg Paving. This practice appears to be a shortcut way of Yon making a loan to Mecklenburg Paving that saved a check and some administration.

26. Although the claim is accepted in general, the Court concludes some portions of the same are not allowable, at least against this Debtor. Of the $1,194.715.98 claimed in Plaintiff's Exhibit P–7, the Court makes appropriate reductions, which are discussed by the category in which they appeared:

**a] Storm Drainage (P–9): $25,727.32 Claimed**

The non-overhead portion of this claim before deduction is $20,337.80 ($25,727.32 – 5,389.52). Yon hired outside contractors, Foster Grading and Donald Mauney, to construct the storm drains. While the bills of these parties include these outside contractors' overhead, Mecklenburg Paving's employees coordinated and supervised the work of those parties, and the Court deems it appropriate to allow Plaintiff its overhead on these charges. The base charges eligible for overhead of $20,337.00 when multiplied by the overhead rate of 26.5% yields allowable overhead of $5,389.52. The total Storm drainage claim is therefore $25,727.32 ($16,137.97 + 4,276.56), the amount claimed by the Plaintiff.

**b] Grading & Landscaping (P–11): $291,663.52 Claimed**

The non-overhead portion of this claim for grading/landscaping is $230,564.05 ($291,663.52 – 61,099.47). Some $96,000 of this sum is Yon's estimate of the rental value of the equipment Mecklenburg Paving provided for use on the projects for the time it was used ($8,000 @ 12 months). For the reasons stated above, the Court generally accepts Yon's numbers as the total cost of labor and equipment. However, as the equipment rental rates cited are based upon what an

outside supplier would charge and therefore include overhead, this should not be charged again. The Court therefore reduces the part of the claim upon which overhead is computed by $25,440 ($96,000.00 × 26.5%) to $70,560.

Yon also charges $130,000 of labor on this part of the project without breakdown of who and what this is for, and whether any of this is included in his overhead. Mecklenburg Paving's evidence (P–8) at trial indicated that Plaintiff's entire payroll for November 1991–92 was $444,086.87. Yon testified only $345,000 of outside work was done by his company during this period, and therefore 82% of his company's work for this period was on the Debtor's projects. Plaintiff has therefore claimed a total of $360,000 of his labor in its proof of claim (an additional $230,000 is listed in the Dam charges (P–15)) without backing out labor included in its overhead. Plaintiff then adds overhead on top of his total labor cost, at the 26.5% figure. This double bills indirect labor to the Debtor.

A review of Plaintiff's evidence (P–19) reflects that $108,435.56 of his $444,086.87 total wages were for administrative and supervisory labor. To avoid charging this indirect labor twice, this number must be backed out of the total labor figure to ascertain the total direct labor billable to the debtor before overhead ( [Total labor-overhead labor] × .82 = total direct labor chargeable to Debtor, or [$444,086.87 – 108,435.56] × .82 = $275,234.07). Total direct labor chargeable to the Debtor before overhead is $275,234.07. The portion of the direct labor allocable to Grading/landscaping is $99,084.27 ($130,000/360,000 = 36% × $275,234.07). This results in $174,208.32 of Grading and Landscaping charges eligible for overhead ($4,564.05 + 70,560.00 + 99,084.27), which when overhead is added (26.5%) yields a total allowable Grading/Landscaping claim of $220,373.52 ($174,208.27 + $46,165.20).

**c] Water & Sewer (P–10A & B): $128,101.06 Claimed**

The total non-overhead claim for water & sewer is $101,265.66. As in the case of the storm sewer, Mecklenburg Paving did not perform water/sewer installation but instead subbed this out to third parties, Wit-ni and Donald Thomas. Overhead should still be allowed by Mecklenburg Paving to their

charges, so no further deduction should be made and Mecklenburg Paving should be allowed a claim for Water and Sewer of $128,101.06.

**d] Stone & Site Work: $88,957.00 Claimed**

The Plaintiff's paving bill for this work which it performed is quoted at the price that it would charge to outside customers and contains overhead as well as its direct costs. Mecklenburg Paving has not added overhead to this bill so no adjustment is required for this. However, the evidence presented was that the Debtor made two payments of $10,000.00 and $35,000.00 as against the paving charges. The claim should therefore be allowed, after deduction for these payments, at $43,957.00.

**e] Dam (P–15): $484,393.68 Claimed**

Plaintiff's out-of-pocket expenses on the dam total $387,919.91. Some $5,000 claimed by Mecklenburg Paving here is for money loaned by Yon to the Plaintiff. Yon testified this was erroneously included in the claim and this has been withdrawn. Another $20,000 was claimed listed for equipment rental, but only $14,400 was shown to have been spent. Accordingly, this charge should be reduced by $5,600. Yon also charges for $230,000 of labor on this phase of the project. For reasons stated in subparagraph b above, and to avoid charging indirect labor twice, this number must be adjusted to isolate direct labor before overhead is applied. The Court concludes the direct labor allocable to the Dam is $180,149.80 ($230,000/360,000 = 64% × $275,234.07 = $176,149.80). This results in $327,469.71 of allowable costs before overhead is applied.

Of this sum, $43,239.48 (Subsurface $22,239.48; Bud Lee $14,000; Wallace $7,000) were payments to the engineers who supervised Plaintiff's employees in building of the dam. Plaintiff should be entitled to add its overhead, as it coordinated the work of these parties. No deduction being made, the claim eligible for overhead is $327,469.71, which when multiplied by the overhead rate of 26.5% yields allowable overhead charges of $86,779.47. This number, when added to the allowable out of pocket costs yields a total Dam claim of $414,249.18 ($327,469.71 + $86,779.47).

**f] Miscellaneous: $162,723.40 Claimed**

This claim, as filed, and before overhead totals $128,635.10. The Court for reasons stated herein, generally allows this part of Mecklenburg Paving's claim, although it includes loans and work not specified by the written contracts. These charges include items that benefitted Bill Nolan personally, including payments of Nolan's personal expenses and loans to him by Plaintiff. If these items were treated as debts of the company, competing with other creditors, several would be avoidable fraudulent conveyances, Nolan, and not the company or its estate, received the benefit thereof. However, since the Plaintiff's claims are equity, there is no injustice in allowing them. Mecklenburg Paving, for its work and expenditures, effectively purchased an equity stake in Providence Hills from its sole shareholder, Bill Nolan. Some of Mecklenburg Paving's expenditures may have benefitted Nolan personally; however, they were paid for not by the Debtor's property but from Nolan's equity.

Another $10,000 claimed here represents Yon's promised profit on the two lots he and his wife purchased from the Debtor. As the Court is basing the allowable claim on Plaintiff's actual costs and treating Plaintiff's claim as equity (which may later yield profit), Mecklenburg Paving's claim should be limited to its actual costs. This part of the claim is disallowed. The allowable claim before overhead is therefore $118,635.10.

As to overhead, overhead will be allowed on the work of outside contractors whose work was supervised and coordinated by Plaintiff. It is not to be allowed on nonconstruction items. The following expenses are not eligible for overhead:

| | |
|---|---|
| Matthew's Oil | $ 262.09 |
| Dan Martin | $ 500.00 |
| Sanders & Millette | $ 250.00 |
| Sanders & Millette | $ 129.00 |
| Doug Plyer | $ 2,200.00 |
| Henry Smith | $ 1,086.00 |
| Henry Smith | $ 2,250.00 |
| Lake Providence | $ 2,000.00 |
| Lake Providence | $15,000.00 |
| BB & T | $ 627.95 |
| BB & T | $ 1,883.85 |
| BB & T | $ 1,255.90 |
| BB & T | $ 627.95 |
| | $26,816.84 |

The remaining sum, $91,818.26, which when multiplied by the overhead rate of 26.5%, yields allowable overhead of $24,331.84. The total allowable Miscellaneous category charges are therefore $142,966.94 ($118,635.10 + 24,331.04).

g] **Loans/corporate: $13,150.00**

For reasons stated in subparagraph f, above, the Court allows these loans to Bill Nolan as filed. No overhead was sought by Plaintiff on these.

h] **FICA:** Although not included in the claim (P–7) itemization, evidence was presented that the Plaintiff had FICA expense of $27,852.00. The Court adds these charges to this claim without additional overhead.

27. Given the foregoing, the Plaintiff's allowed claim is:

| | Item | Total claimed | Allowed |
|---|---|---|---|
| 1. | Storm Drainage: | $ 25,727.32 | $ 25,727.32 |
| 2. | Grading & Landscaping | $ 291,663.52 | $ 220,373.52 |
| 3. | Water & Sewer | $ 128,101.06 | $ 128,101.06 |
| 4. | Stone & Site Work | $ 88,957.00 | $ 43,957.00 |
| 5. | Dam | $ 484,393.68 | $ 414,249.18 |
| 6. | Miscellaneous | $ 162,723.40 | $ 142,966.94 |
| 7. | Loans/corporate | $ 13,150.00 | $ 13,150.00 |
| 8. | FICA | $ NA | $ 27,852.00 |
| | Totals | $ 1,194,715.98 | $ 1,016,377.02 |

28. In reaching this verdict, the Court notes that Plaintiff's total fee stated in the Joint Venture Agreement ($1,687,000), less the amounts that the Trustee's engineer, testified that it would take to complete Providence Hills ($600,000), and the costs to complete the Dam ($170,000) equals $917,000. This is very close to the amounts allowed in this ruling and corroborates that calculation.

29. As to the filed claim of the lien, the Court finds no basis for the allowance of the same, particularly given the nature of Mecklenburg Paving's interests in these projects. The Claim of Lien should be deemed void and stricken from the public record.

BASED UPON the foregoing, the Court hereby ORDERS as follows:

1. Paving Equipment of Carolina, Inc., d/b/a Mecklenburg Paving should be allowed a claim of $1,016,377.02, as a secured equity interest in Providence Hills subdivision, subordinate to all other allowed claims in this case, except the other equity claims of the Debtor and Bill Nolan to which it shall be superior in priority and entitlement to payment.

2. The Trustee, and any successor in interest on behalf of the Debtor's estate shall be entitled to use, sell, and dispose of the aforementioned real property free and clear of this equity interest until such time as all allowable claims of creditors of this estate are paid in full as provided for under Title 11. At such point, this claim shall be entitled to payment in full from the proceeds of lot sales, before any distribution is made to the Debtor or William Nolan.

3. The Deed of Trust in favor of Plaintiff and its Claim of Lien shall be declared null and void and shall be stricken from the public record.