LADCO PROPERTIES XVII, L.L.C., Plaintiff,

v.

JEFFERSON–PILOT LIFE INSURANCE COMPANY, Defendant.

No. 4:06–cv–00088.

United States District Court, S.D. Iowa, Central Division.

Nov. 13, 2007.

Scott D. Mikkelsen, Stanley J. Thompson, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiff.

Debra Lynne Hulett, Richard J. Sapp, Nyemaster Goode West Hansell & O'Brien, Des Moines, IA, C. Bailey King, Jr., Robert R. Marcus, Smith Moore LLP, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION AND ORDER

### ROBERT W. PRATT, Chief Judge.

Before the Court are two motions for summary judgment. On July 2, 2007, Defendant, Jefferson–Pilot Life Insurance Company ("Jefferson–Pilot"), filed a Motion for Summary Judgment. Clerk's No. 31. Also on July 2, 2007, Plaintiff, Ladco Properties XVII, L.L.C. ("Ladco"), filed a Motion Summary Judgment. Clerk's No.

30. Jefferson–Pilot resisted Ladco's Motion for Summary Judgment on July 26, 2007 (Clerk's No. 33); on that same day, Ladco resisted Jefferson–Pilot's Motion for Summary Judgment. Clerk's No. 32. On August 10, 2007, both Jefferson–Pilot and Ladco filed their respective replies. Clerk's Nos. 36, 38. Ladco has requested oral argument on this matter, however, the Court finds that such argument would not materially aid the resolution of this case. Accordingly, the matter is fully submitted.

## I. FACTUAL BACKGROUND

For the most part, the parties do not dispute the facts of this case.[1] Ladco is an Iowa limited liability company. Pl.'s Am. Statement of Material Facts ¶ 1. Ladco was formed on November 12, 2002, for the purpose of developing a medical office facility in Ankeny, Iowa, in conjunction with Mercy Medical Center, referred to as Mercy North. Id. ¶¶ 1, 2. Ladco secured construction financing from a local bank and two local insurance companies. Id. ¶ 5. The Mercy North project involved 95,286 square feet of rentable space. Id. ¶ 3. By 2004, Mercy Medical Center agreed to rent approximately 53,000 square feet at Mercy North. Id. ¶ 4. Ladco, meanwhile, sought tenants for the additional space. Id.

Some time in 2004, Ladco retained Venture Mortgage, a mortgage broker, to obtain sources of permanent financing for Mercy North. See id. ¶¶ 5, 6. Venture Mortgage presented Ladco with competing loan proposals from three different lenders. Def.'s Statement of Material Facts ¶ 9. One of the lenders was Jefferson–Pilot, an insurance company based in Greensboro, North Carolina.[2] Pl.'s Am. Statement of Material Facts ¶¶ 6, 7. Ladco

---

**1.** Unless otherwise noted, the facts stated herein are uncontested.

**2.** Jefferson–Pilot does business nationwide and employs approximately 1,200 employees at its Greensboro headquarters. See Pl.'s Am. Statement of Material Facts ¶ 7.

submitted a loan application and other Mercy North project information to Jefferson–Pilot. *Id.* ¶ 9. On or about December 15, 2004, Jefferson–Pilot approved Ladco for a loan in the amount of $12,590,000, with an interest rate of 5.66%. *Id.* Prior to entering into a mortgage loan commitment, Ladco had its attorney review the loan commitment, and Ladco negotiated several provisions of the loan commitment. Def.'s Statement of Material Facts ¶ 10. Although Ladco denies that its attorney negotiated any terms of the Deposit clause,[3] Ladco does admit that aspects of the Deposit clause were negotiated.[4] *Id.* ¶ 11; Pl.'s Response to Def.'s Statement of Additional Material Facts ¶ 5.

On January 14, 2005, Jefferson–Pilot and Ladco entered into a mortgage loan commitment ("the Loan Commitment"), in which Jefferson–Pilot agreed, under certain conditions, to make a permanent loan to Ladco in the amount of $12,590,000 in connection with the Mercy North project. Def.'s Statement of Material Facts ¶ 1. Under the terms of the Loan Commitment, however, Jefferson–Pilot was obligated to fund the loan only if Ladco satisfied certain conditions precedent before the Loan Commitment expired.[5] *Id.* ¶ 3. One of the conditions precedent was that Ladco secure fully executed leases with tenants generating a minimum annual rent of $1,265,000 before the Loan Commitment expired ("Leasing Requirement"); that is, lease out approximately 90% of the total rentable space at Mercy North. *Id.;* Pl.'s Am. Statement of Material Facts ¶ 14.

The Leasing Requirement, in effect, ensured that Ladco would have sufficient cash flow from rent payments to meet its debt obligation to Jefferson–Pilot. *See* Pl.'s Am. Statement of Material Facts ¶ 15. Thus, the Leasing Requirement was a risk reducing measure for Jefferson–Pilot. *Id.* ¶ 16.

Further, under the terms of the Loan Commitment, Ladco agreed to provide a deposit of three percent of the loan amount, or $377,700 ("the Deposit"), which was to be retained by Jefferson–Pilot in the event that the loan did not close before the expiration date. Def.'s Statement of Material Facts ¶ 6. Specifically, the Deposit provision states:

Upon acceptance of this [Loan] Commitment, [Ladco] shall pay [Jefferson–Pilot] a deposit (the "Deposit") in the amount of $377,700.00, of which $125,900.00 must be in cash and $251,800.00 may be in the form of an irrevocable letter of credit ... The Deposit shall be held by [Jefferson–Pilot], without interest, as partial consideration for [Jefferson–Pilot's] committing to make the Loan and reserving the funds for that purpose, and [Ladco] shall become obligated to borrow the Loan. When the Loan is closed in accordance with the terms of this [Loan] Commitment, the Deposit less $20,000.00 shall be refunded to [Ladco]. Upon [Jefferson–Pilot's] receipt of all executed documents ... and all other items required under this [Loan] Commitment, [Jefferson–Pilot] shall return

---

**3.** The Deposit clause will be discussed further *infra.*

**4.** Jefferson–Pilot contends that Venture Mortgage, on behalf of Ladco, negotiated an agreement with Jefferson–Pilot, whereby a portion of the deposit could be paid in the form of a letter of credit rather than cash. Def.'s Br. in Support of Mot. for Summ. J. at 4.

**5.** The Loan Commitment was initially scheduled to expire on July 29, 2005. Def.'s App. at 1. The Loan Commitment, however, was amended to provide Ladco with the option to extend the expiration of the Loan Commitment for two consecutive thirty-day periods, to August 29, 2005, and to September 28, 2005, with interest increasing with the exercise of each extension, to 5.73% and 5.80% respectively. *Id.* at 144.

the remaining $20,000.00 to [Ladco]. In the event that the Loan does not close by the Expiration Date (except solely through [the] wrongful failure of [Jefferson–Pilot] to fund [the Loan] . . .), the Deposit will be forfeited as liquidated damages and becomes the sole property of [Jefferson–Pilot] and will be considered earned in payment for the time, effort, and expenses of [Jefferson–Pilot's] employees expended in the review and study of the Property and the documents pertaining to the proposed Loan, and the reservation by [Jefferson–Pilot] of funds necessary for the Closing of the Loan. It is understood and agreed that an actual determination of [Jefferson–Pilot's] expenses is not feasible and that the Deposit represents a reasonable estimate of such costs and expenses.

Pl.'s App. at 35–36.

Unfortunately, despite Ladco's good faith efforts to satisfy the Leasing Requirement, Ladco experienced difficulty. Pl.'s Am. Statement of Material Facts ¶ 21. Ladco's difficulty stemmed from delays in two prospective tenants executing their leases due to uncertainties in the number of "units" Mercy Medical Center was willing to "sell" to them. *Id.* Accordingly, because Ladco was unable to meet the Leasing Requirement, it exercised its option to extend the expiration date to September 28, 2005. Def.'s Statement of Material Facts ¶ 13. However, at some point, Ladco realized that it would be unable to meet the Leasing Requirement by September 28, 2005. *Id.* ¶ 14. Thus, on or about September 21, 2005, Ladco requested an extension of the Loan Commitment to December 16, 2005. *Id.* ¶ 15. At that time, Ladco informed Jefferson–Pilot of the situation with the two prospective tenants, and indicated that 66% of Mercy North space was currently leased and occupied, and that 72% of Mercy North would be leased and occupied by December 1, 2005. Pl.'s App. at 50–51; Pl.'s Am.

Statement of Material Facts ¶ 22. In response, Jefferson–Pilot proposed an addendum in which it offered to extend the Loan Commitment to December 30, 2005. Def.'s Statement of Material Facts ¶ 16. The proposed addendum, dated October 4, 2005, provided that Ladco had until October 10, 2005 to return the executed addendum to Jefferson–Pilot, or the Loan Commitment would be deemed expired. Pl.'s App. in Support of Pl.'s Resistance at 29–30. Although Ladco did not return the executed addendum by October 10, 2005, Jefferson–Pilot continued to proceed in good faith toward a closing date in late December, based on assurances from Ladco that the executed addendum was forthcoming. Def.'s Statement of Material Facts ¶¶ 18, 19.

In a letter dated October 13, 2005, Ladco informed Jefferson–Pilot that due to prospective tenant delays, meeting the Leasing Requirement by the expiration date was uncertain. *See* Pl.'s App. at 52. Ladco, however, offered to have Jon Garnaas, Ladco's principal, personally guarantee the remaining lease space; that is, enter into a "master lease" to assure Jefferson–Pilot of Ladco's income stream. *See id.* The "master lease," in turn, would be released at such time as new tenants leased and occupied the space. *See id.* Jefferson–Pilot claims that it never received this letter. Def.'s Response to Pl.'s Am. Statement of Material Facts ¶ 25. Regardless, it again became apparent that Ladco would be unable to meet the Leasing Requirement by December 30, 2005. *See* Def.'s Statement of Material Facts ¶ 20.

In a letter dated December 13, 2005, Ladco requested that the Loan Commitment be extended for an additional nine months, to September 30, 2006. *Id.* ¶ 22. Ladco attached a modified copy of the October 4, 2005 proposed addendum to the

letter. *See id.* ¶ 23. In a letter dated December 15, 2005, Jefferson–Pilot rejected Ladco's request for an extension until September 30, 2006, and the modifications to the proposed addendum. *Id.* ¶ 25. Jefferson–Pilot stated that because Ladco did not accept the October 4, 2005 addendum by October 10, 2005, as provided for by the terms of the addendum, the Loan Commitment was deemed expired on September 28, 2005. Def.'s App. at 150–51. In addition, Jefferson–Pilot informed Ladco that, pursuant to the terms of the Loan Commitment, the Deposit had been "forfeited as liquidated damages as a result of Ladco's failure to fulfill its obligations under the [Loan] Commitment." *Id.* at 151. Presently, Ladco seeks the return of the Deposit.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.* The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the

moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, or admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present sufficient evidence for a reasonable trier of fact to return a verdict in his or her favor. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548. On a motion for summary judgment, a court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990) (citing *Woodsmith Pub. Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990)). A court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

In the present case, both sides have moved for summary judgment on Ladco's claims. Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See id.* (citing *Anderson,* 477 U.S. at

249, 106 S.Ct. 2505 and 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2712 (3d ed.1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Twp. Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat. Bank,* 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.,* 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson,* 182 F.Supp.2d 765, 769 (N.D.Iowa 2001). Nevertheless, "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998).

### III. LAW AND ANALYSIS

Ladco filed a one count complaint seeking the return of the Deposit. Specifically, Ladco argues that the failure to satisfy the Leasing Requirement did not amount to a breach of contract because the Leasing Requirement is a condition precedent to the Loan Commitment. That is, once Ladco failed to satisfy a condition precedent to the Loan Commitment, no valid Loan Commitment existed for Ladco to breach. In the alternative, Ladco contends that if it did breach the Loan Commitment, the Deposit forfeited as liquidated damages is, in fact, an unlawful penalty. Because the Loan Commitment is governed by the laws of North Carolina,[6] the Court turns to North Carolina law to determine whether the condition precedent at issue is a condition precedent to the Loan Commitment, and if not, whether the forfeiture of the Deposit is an unlawful penalty. The Court will address each argument in turn.

#### A. Breach of Contract

To determine whether the Leasing Requirement is a condition precedent to the Loan Commitment, the Court turns to the language of the contract. The Leasing Requirement provides, in relevant part:

### III. CONDITIONS PRECEDENT

The following requirements must be met by [Ladco] to the satisfaction of [Jefferson–Pilot] and *are conditions precedent to the funding of the Loan:*

A. Leases: The tenants and the form, terms and conditions of all leases relat-

---

**6.** The parties agree that the Loan Commitment is governed by the laws of North Carolina. Def.'s Statement of Material Facts ¶ 7.

ing to the Property must be satisfactory to and approved by [Jefferson–Pilot]. At the Closing, the leases set forth on Exhibit "A" attached hereto and incorporated herein (the "Required Leases"), must be in existence, fully executed, and not in default, containing the terms listed on Exhibit "A", and generating a minimum annual rent of $1,265,000.00, exclusive of tenant contributions for taxes, insurance and common area maintenance.

Pl.'s App. at 33 (emphasis added); Def.'s App. at 144.

■ Ladco argues that the Leasing Requirement is a condition precedent to the Loan Commitment. Ladco contends that, because it did not satisfy the Leasing Requirement, there was no valid Loan Commitment for Ladco to breach. Jefferson–Pilot, however, argues that the clear language of the Loan Commitment illustrates that the Leasing Requirement is not a condition precedent to the Loan Commitment. A condition precedent is a fact or event, " 'occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.' " *Cargill, Inc. v. Neuse Prod. Credit Assoc., Inc.,* 26 N.C.App. 720, 217 S.E.2d 105, 107 (1975) (quoting 3A Corbin, *Contracts,* § 628 at 16 (1960)). Thus, if the Leasing Requirement is, indeed, a condition precedent to the Loan Commitment, then liquidated damages would be improper in this case. *See Harris & Harris Constr. Co., Inc. v. Crain & Denbo, Inc.,* 256 N.C. 110, 123 S.E.2d 590, 595 (1962) (explaining that if parties negotiate a condition precedent to the contract, then the performance of the condition is essential before parties become bound to the contract).

■ In North Carolina, "the goal of [contract] construction is to arrive at the intent of the parties when the [contract] was issued." *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.,* 351 N.C. 293, 524 S.E.2d 558, 563 (2000). In reviewing the language of the Leasing Requirement to arrive at the intent of the parties, the Court finds that the Leasing Requirement is not a condition precedent to the Loan Commitment. First, as noted above, the express language of the Loan Commitment unambiguously states that the Leasing Requirement is a condition precedent to the funding of the Loan, not a condition precedent to the validity of the Loan Commitment. *See Martin v. Vance,* 133 N.C.App. 116, 514 S.E.2d 306, 309 (1999) (stating that when a contract is unambiguous on the face of the document, courts must interpret the document as written). That is, Ladco's failure to meet a condition precedent to the funding of the loan does not affect the validity of the Loan Commitment. *See Harris & Harris Constr. Co.,* 123 S.E.2d at 596 ("The fact that no duty of performance on either side can arise until the happening of a condition does not necessarily make the validity of the contract depend upon it happening."). There is no indication in the Loan Commitment that suggests that Jefferson–Pilot's *commitment* to make the loan of up to $12,590,000 was conditional and dependent upon Ladco satisfying the Leasing Requirement by the expiration date. *See Cargill,* 217 S.E.2d at 107 (explaining the difference between a condition precedent and a promise).

Moreover, reading the Loan Commitment as a whole, and in reference to other provisions, it is evident that the Leasing Requirement is not a condition precedent to the Loan Commitment. *See Jones v. Casstevens,* 222 N.C. 411, 23 S.E.2d 303, 305 (1942) ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the

separate parts mean, but what the contract means when considered as a whole." (citations omitted)). For example, reading the Leasing Requirement provision in reference to the Deposit provision demonstrates that the validity of the Loan Commitment is independent from conditions required for the funding of the loan. Specifically, the Deposit provision provides:

In the event the Loan does not close by the Expiration Date *(except solely through [the] wrongful failure of [Jefferson–Pilot] to fund [the Loan] . . .)*, the Deposit will be forfeited as liquidated damages. . . .

Pl.'s App. at 36 (emphasis added). The emphasized portion of the Deposit provision illustrates that the parties contemplated certain situations where Jefferson–Pilot could "rightfully fail" to fund the loan, yet maintain the Deposit as liquidated damages. The situations contemplated refer back to Section III of the Loan Commitment, where the parties identified certain conditions precedent for the funding of the Loan, including the Leasing Requirement. *See* Pl.'s App. at 33–35. Section III clearly and unambiguously provides: "The following requirements must be met by [Ladco] to the satisfaction of [Jefferson–Pilot] and are conditions precedent to the funding of the Loan." *Id.* at 33.

Additionally, if the Termination clause of the Loan Commitment is read in reference to the Leasing Requirement, it is again evident that the Leasing Requirement is not a condition precedent to the Loan Commitment. The Termination clause provides, in part: "This [Loan] Commitment shall be deemed terminated at [Jefferson–Pilot's] *option* in any of the following events . . . (ix) the terms and conditions of this Commitment are not satisfied." Pl.'s App. at 36 (emphasis added). If the Leasing Requirement is, indeed, a condition precedent to the Loan Commitment, then the Termination clause would be unnecessary, as the Loan Commitment

would automatically be deemed invalid upon Ladco's failure to satisfy the Leasing Requirement. Thus, to conclude that the "conditions precedent" found in Section III apply to the validity of the Loan Commitment would result in an unreasonable interpretation of the contract as a whole. *C & H P'ship v. Shaw Indus. Group, Inc.*, No. 1:04CV00323, 2006 WL 1229001, *6, 2006 U.S. Dist. LEXIS 27231, at *19 (M.D.N.C. May 4, 2006) (explaining "contracts will be construed as a whole with each part being given an effect, but also being considered with reference to the other provisions of the contract"). Furthermore, as noted above, adopting Ladco's interpretation of the Leasing Requirement as a condition precedent to the Loan Commitment would deem various terms of the Loan Commitment useless. *See Gaston County Dyeing Mach. Co.*, 524 S.E.2d at 563 ("The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect."). Here, the Court concludes that based on the plain language of the Loan Commitment and construing the Loan Commitment as a whole, the Leasing Requirement is not a condition precedent to the Loan Commitment. Therefore, when Ladco was unable to satisfy the Leasing Requirement pursuant to the terms of the Loan Commitment, Ladco was in breach of the contract.

### B. *Liquidated Damages*

Because the Court finds that Ladco was in breach of the Loan Commitment, the Court must determine whether the forfeiture of Ladco's $377,700 deposit is a liquidated damage or a penalty. Liquidated damages are "a sum which a party to a contract agrees to pay or deposit which he agrees to forfeit, if he breaks some promise . . . arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue

from the breach...." *Knutton v. Cofield,* 273 N.C. 355, 160 S.E.2d 29, 34 (1968) (quoting McCormick, *Damages* § 146 (1935)). A penalty, on the other hand, is "a sum which a party similarly agrees to pay or forfeit ... but which is fixed, not as a pre-estimate or probable actual damages, but as a *punishment,* the threat of which is designed to prevent the breach...." *Id.* (quoting McCormick, *Damages* § 146, quoted with approval in *Kinston v. Suddreth,* 266 N.C. 618, 146 S.E.2d 660, 662 (1966)).

 In North Carolina, a liquidated damage provision is enforceable when: (1) damages are speculative or difficult to ascertain, and (2) the amount stipulated is a reasonable estimate of probable damages, or the amount stipulated is reasonably proportionate to the damages actually caused by the breach. *Id.* Ladco, as the party seeking to invalidate the liquidated damages provision, has the burden of establishing that the provision is an unenforceable penalty. *Seven Seventeen HB Charlotte Corp. v. Shrine Bowl of the Carolinas, Inc.,* 641 S.E.2d 711, 714 (N.C.Ct. App.2007). Here, Ladco argues that the damages were not difficult to ascertain, and that the amount stipulated is an unreasonable estimate of probable damages, or that the amount stipulated is not reasonably proportionate to the damages actually caused by the breach.[7] Jefferson–Pilot, on the other hand, argues that the damages were difficult to ascertain, and the amount stipulated is a reasonable estimate of probable damages.

**1. Were damages speculative or difficult to ascertain?**

 Ladco states that the damages were not difficult to ascertain at the time the Loan Commitment was signed. Specifically, Ladco contends that the potential damages consisted of Jefferson–Pilot's cost of processing the loan, e.g., payment for the time, effort, and expense of Jefferson–Pilot's employees in reviewing the property, preparing documents, and any costs arising from the reservation of funds necessary for the closing of the Loan. The question of "whether damages are difficult of ascertainment is to be determined by consideration of the status of the parties at time they enter into the contract, and not at the time of the breach." *Green Park Inn, Inc. v. Moore,* 149 N.C.App. 531, 562 S.E.2d 53, 58 (2002). At the time the parties entered into the Loan Commitment, Ladco expressly "agreed that an actual determination of [JeffersonPilot's] expenses is not feasible...." Pl.'s App. at 36. Now, post-breach, Ladco contends that the damages were not difficult to ascertain.

Ladco states that the methodology to determine Jefferson–Pilot's damages is "straightforward." Pl.'s Resistance Br. at 7. Ladco points to its expert's method, which was used to estimate the damages Jefferson–Pilot allegedly suffered as a result of the breach. This, Ladco argues, demonstrates that the damages were not speculative or difficult to ascertain at the time the parties entered into the Loan Commitment. The methodology, apparently, even takes into account the "fluctuations in interest rates" which may affect

---

7. In North Carolina, to demonstrate that the amount stipulated is a liquidated damage, the party need not demonstrate that the amount stipulated was both a reasonable estimate of probable damages *and* that the amount stipulated is reasonably proportionate to the actual damages. *See Ledbetter Bros., Inc. v. N.C. Dep't of Transp.,* 68 N.C.App. 97, 314 S.E.2d 761, 767 (1984) (stating that the party must show that the stipulated amount is "either a reasonable estimate of the damages ... *or* is reasonably proportionate to the [actual] damages"). Because Jefferson–Pilot argues the reasonable estimate element, the Court will only discuss the reasonable estimate.

Jefferson–Pilot's damages. *Id.* The Court, then, is left to wonder why Ladco did not provide this "straightforward" information at the time the parties entered into the Loan Commitment. Not only did Ladco fail to share this "straightforward" information with Jefferson–Pilot, but Ladco agreed to contract language that was directly contrary to Ladco's knowledge—Ladco claimed to understand and agreed that an actual determination of Jefferson–Pilot's damages in the event of a breach was not feasible at the time the parties entered into the contract. *See* Pl.'s App. at 36. Given Ladco's option to extend the Loan Commitment expiration date, the uncertainty in the fluctuating interest rates, and the unambiguous language of that portion of the Deposit provision, the Court concludes the potential damages were speculative and difficult to ascertain at the time the parties entered into the Loan Commitment. *See Olive v. Williams*, 42 N.C.App. 380, 257 S.E.2d 90, 93 (979) ("Clear and express language of the contract controls its meaning, and neither party may contend for an interpretation at variance with the language on the ground that the writing did not fully express his intent.").

### 2. *Was the Deposit a reasonable estimate of the probable damages?*

 "The basic test of the reasonableness of an agreement liquidating damages is whether the stipulated amount or amount produced by the stipulated formula represents a reasonable forecast of the probable loss." *Coastal Leasing Corp. v. T–Bar S Corp.*, 128 N.C.App. 379, 496 S.E.2d 795, 798 (1998) (citation omitted). In making such a determination, however, the Court should keep in mind that the clause was "negotiated by the parties, who are familiar with the circumstances and practices with respect to the type of transaction involved, and the clause carries with it a consensual apportionment of the risks of the agreement that a court should be slow to overturn." *Id.* at 798 (citation omitted). The Deposit provision, in its entirety, is noted above in the Facts section, however, for ease of reference, the Court refers to the applicable portion of the Deposit provision, which states:

> Upon acceptance of this [Loan] Commitment, [Ladco] shall pay [Jefferson–Pilot] a deposit (the "Deposit") in the amount of $377,700.00 [8].... In the event that the Loan does not close by the Expiration Date ..., the Deposit will be forfeited as liquidated damages and becomes the sole property of [Jefferson–Pilot] and will be considered earned in payment for the time, effort, and expenses of [Jefferson–Pilot's] employees expended in the review and study of the Property and the documents pertaining to the proposed Loan, and the reservation by [Jefferson–Pilot] of funds necessary for the Closing of the Loan. It is understood and agreed that an actual determination of [Jefferson–Pilot's] expenses is not feasible and that the Deposit represents a *reasonable estimate* of such costs and expenses.

Pl.'s App. at 36 (emphasis added).

Ladco argues that the Deposit is not a reasonable estimate of the actual damages suffered by Jefferson–Pilot as a result of the breach because "even though [interest] rates move[ ] down, it is still a rarity that a Jefferson–Pilot loan does not close—over 99.5% of all loans with a negotiated commitment letter close." Pl.'s Br. in Support for Mot. for Summ. J. at 10. The Court is unclear why this statistic is relevant to the analysis of whether the Deposit is a reasonable estimate of Jefferson–Pilot's probable damages. It appears that Ladco is implying that because the three percent deposit is only forfeited in .5% of Jefferson–Pilot's loan commitment transactions,

---

**8.** The Deposit, $377,700, is three percent (3%) of the total loan amount, $12,590,000.

the three percent deposit is not reasonable.[9] The fact that loan commitments are rarely breached, making forfeitures a rare occurrence, does not make the forfeiture clause de facto unreasonable.

Regardless, Ladco continues by stating that Jefferson–Pilot "testified [that] it cannot determine U.S. Treasury rates with any certainty and [such an attempt] would be a random 'walk in the woods.'" *Id.* This testimony, Ladco argues, shows that Jefferson–Pilot acknowledges that the Deposit is not a reasonable estimate of probable damages because, by Jefferson–Pilot's own admission, damages are, in fact, impossible to determine.[10] *Id.* Following Ladco's logic, any time there is a liquidated damages clause, the estimate would be deemed unreasonable because the probable damages are difficult or "impossible" to determine with any type of probability. The liquidated damages provision is just that, a reasonable estimate of probable damages because the probable damages are speculative. In this instance, because the probable damages were difficult to determine at the time of entering into the Loan Commitment, both parties agreed that three percent of the total loan amount would be a reasonable estimate of the probable damages. *See* Pl.'s App. at 36 ("It is understood and agreed that ... the Deposit represents a reasonable estimate of such costs and expenses."); *see also Fidelity & Cas. Co. of N.Y. v. Nello L. Teer Co.,* 250 N.C. 547, 109 S.E.2d 171, 173 (1959) (stating that in construing a contract, neither party can obtain an interpretation contrary to the express language of the contract); *Burden Pallet Co., Inc. v. Ryder Truck Rental, Inc.,* 49 N.C.App. 286, 271 S.E.2d 96, 97 (1980) (stating that the object of a signature to a contract is to show assent).

██ The parties in this case, moreover, are sophisticated business entities. Ladco argues that unequal bargaining power existed between Jefferson–Pilot and itself, pointing out the financial disparity between Jefferson–Pilot and Ladco. Although the parties may have disparate financial positions—indeed, one is the lender of funds, while one is the borrower of funds—the parties, nonetheless, had equal bargaining power in this case. For example, Ladco retained the services of a mortgage broker to access permanent financing for Mercy North, received three offers from different lenders—one of which offered a lower deposit requirement than Jefferson–Pilot, determined that Jefferson–Pilot offered the most "attractive" package, negotiated several provisions contained in the Loan Commitment, including the Deposit clause, retained counsel from a prominent law firm to review the Loan Commitment, and entered into the Loan Commitment. *See* Pl.'s Am. Statement of Material Facts ¶¶ 5, 6; Def.'s Statement of Material Facts ¶¶ 9, 11; Def.'s Additional Statement of Material Facts ¶¶ 3, 5; Pl.'s Response to Def.'s Statement of Additional Material Facts ¶ 5. Thus, considering the nature of the contract, the intention of the parties as expressed in the contract, the contract language, the sophistication of the parties,

9. It appears that Ladco's argument presumes that Jefferson–Pilot always utilizes a three percent liquidated damages clause in their loan commitments.

10. The Court notes that in an effort to address the first element of the *Knutton* test, Ladco argues that Jefferson–Pilot's probable damages were not difficult to ascertain and Jefferson–Pilot's arguments to the contrary are incorrect. Yet, Ladco points to the same Jefferson–Pilot arguments, that probable damages were difficult to ascertain, in an effort to address the second element of the *Knutton* test. Ladco's attempt to directly discredit JeffersonPilot's arguments to address the first *Knutton* element, while using the same Jefferson–Pilot arguments to address the second *Knutton* element, undermines Ladco's argument.

the fact that "the parties are better than anyone to determine a reasonable compensation for a breach," and the fact that the probable damages were difficult to ascertain, the Court concludes that the liquidated damages stipulated were a reasonable estimate of the probable damages and not a penalty.[11] *See E. Carolina Internal Med., P.A. v. Faidas,* 149 N.C.App. 940, 564 S.E.2d 53, 57 (2002); *see also Coastal Leasing Corp.,* 496 S.E.2d at 798 (stating that "no court should strike down a reasonable liquidated damage agreement based on foresight that has proved on hindsight to have contained an inaccurate estimate of the probable loss"). Accordingly, Jefferson–Pilot's Motion for Summary Judgment is GRANTED, and Ladco's Motion for Summary Judgment is DENIED. *See Mosely v. WAM, Inc.,* 167 N.C.App. 594, 606 S.E.2d 140, 142 (2004) ("Under the general rules of contract construction, where an agreement is clear and unambiguous, no genuine issue of material facts exists and summary judgment is appropriate.").

## IV. CONCLUSION

For the reasons stated above, Jefferson–Pilot's Motion for Summary Judgment (Clerk's No. 31) is GRANTED, and Ladco's Motion for Summary Judgment (Clerk's No. 30) is DENIED. Accordingly, all subsequent motions filed by the parties (Clerk's Nos. 42, 43, 46, 47, 48, 57, and 60) are DENIED as moot.

IT IS SO ORDERED.

---

11. Ladco also argues that awarding the Deposit as liquidated damages would cause Jefferson–Pilot to gain a windfall. The general rule in North Carolina, however, is that "the amount stipulated in a contract as liquidated damages for a breach, if not a penalty, may be recovered in the event of a breach even though no actual damages are suffered." *Knutton,* 160 S.E.2d at 35. Accordingly, Ladco's arguments regarding Jefferson–Pilot's alleged "windfall" is not relevant to whether the Deposit served as a liquidated damage or a penalty.